The **ANESTHESIA ADVANTAGE, INC.**, a Colorado corporation; Konstantine Kalandros, CRNA; Scott McGlothlen, CRNA; G. Edward Oswald, CRNA; and Raymond Golden, CRNA, Plaintiffs,

v.

The **METZ GROUP**, an unincorporated association; David Heisterkamp, M.D.; Joseph Verbrugge, M.D.; Steven Caputo, M.D.; and Ronald Stevens, M.D., Defendants.

Civ. A. No. 86–B–1235.

United States District Court, D. Colorado.

March 13, 1991.

**640**

Bobbee J. Musgrave, B. Lawrence Theis, Walters & Theis, Denver, Colo., for plaintiffs.

Fred M. Winner, James Hinga, Todd Lundy, Baker & Hostetler, Denver, Colo., for Metz, Heisterkamp, Caputo and Stevens.

Timothy A. LaQuey, Raymond J. Miller, Denver, Colo., for Verbrugge.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Hearing was held on three summary judgment motions filed by individual defendants David Heisterkamp, Joseph Verbrugge, Steven Caputo and Ronald Stevens (the individual Metz defendants) and defendant the Metz Group (collectively Metz defendants). The motions seek judgment on the federal antitrust allegations in the amended complaint of plaintiff the Anesthesia Advantage, Inc., and individual plaintiffs Konstantine Kalandros, Scott McGlothlen, G. Edward Oswald and Raymond Golden (collectively, plaintiffs). Because plaintiffs fail to meet their summary judgment burden. I grant the motions.

CONTENTS

INTRODUCTION ................................................. 641

  I. HUMANA HOSPITAL ................................................. 642
  A. *Events* ................................................. 642
  B. *Defendants' Summary Judgment Motion* ............................. 643
     1. Unreasonable Restraint of Trade: Market Power .................. 643
       a. Per Se Violations Versus Rule of Reason ...................... 644
         i. Price Fixing ......................................... 644
         ii. Market Allocation ................................... 646
         iii. Group Boycott ..................................... 646
       b. Rule of Reason and Market Power .......................... 647
     2. Conspiracy: Independent Action ................................ 649
       a. Ambiguity ............................................. 649

       i.   Call Schedule ......................................... 649
       ii.  Other Evidence ....................................... 649
    b.  Negating Evidence of Independent Interest................... 650

II.  ST. LUKE'S HOSPITAL ............................................ 651
A.  *Events*...................................................... 651
B.  *Defendants' Summary Judgment Motion* ............................ 651
    1.  Unreasonable Restraint of Trade: Market Power................... 652
       a.  Per Se Violations Versus Rule of Reason ..................... 652
       b.  Rule of Reason and Market Power ........................... 652
    2.  Conspiracy: Independent Action ............................... 652
       a.  Ambiguity ............................................... 652
       b.  Negating Evidence of Independent Interest................... 652

III.  ST. MARY'S-CORWIN HOSPITAL ...................................... 653
A.  *Events*...................................................... 653
B.  *Defendants' Summary Judgment Motion* ............................ 653
    1.  Unreasonable Restraint of Trade: Market Power................... 653
    2.  Conspiracy: Independent Action ............................... 653
       a.  Ambiguity ............................................... 654
       b.  Negating Evidence of Independent Interest................... 654
          i.   Plaintiffs' Affidavits ...................................... 654
          ii.  Defendants' Evidence ................................... 654

## INTRODUCTION

This dispute arises between two groups of medical professionals. The individual plaintiffs are certified registered nurse anethetists (CRNA), licensed by the State of Colorado as registered nurses. Plaintiff Anesthesia Advantage, Inc. is a Colorado corporation and successor to High Country Anesthetists, a partnership organized by three of the individual plaintiffs. The shares of Anesthesia Advantage are held in equal proportions by the individual plaintiffs. The Metz defendants are medical doctors licensed by the State of Colorado. Defendant Metz Group is an unincorporated association and its membership includes the individual Metz defendants.

The pendant state claims in the amended complaint have been dismissed, leaving three allegations of federal antitrust law violations against the Metz defendants, each allegedly committed at different hospitals. Count One alleges that the Metz defendants violated section one of the Sherman Act, 15 U.S.C. § 1, at Humana Hospital of Aurora (Humana Hospital) through a conspiracy to restrain trade by price fixing, allocating the market and boycotting as a group. Amended Complaint ¶¶ 72–74.

Counts Four and Six also allege that the Metz defendants violated section one of the Sherman Act by conspiring to restrain trade at St. Luke's Hospital (St. Luke's) through a group boycott and conspiring to restrain trade by threats at St. Mary's–Corwin Hospital (St. Mary's).

■ Section one of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. Thus, the two essential elements of a section one claim are (1) a contract, combination or conspiracy resulting in (2) an unreasonable restraint of trade. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988); *Zimmerman v. Board of Publications of the Christian Reformed Church, Inc.*, 598 F.Supp. 1002, 1009 (D.Colo.1984).

Defendants move for summary judgment on the antitrust claims. Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Summary judgment is appropriate against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The nonmovant must offer evidence to dispute the facts demonstrated by the evidence of the movant. *R–G Denver, Ltd. v. First City Holdings of Colorado*, 789 F.2d 1469, 1471 (10th Cir.1986). The nonmovant cannot rely on conclusory allegations in an affidavit. *Lujan v. National Wildlife Fed'n*, — U.S. ——, ——, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695, 716 (1990).

■■■ In the antitrust context, the allegations of restraint of trade must be supported by significant probative evidence. Ambiguous evidence standing alone is not enough to defend against a motion for summary judgment. *Key Financial Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 638 (10th Cir.1987). Plaintiffs must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Summary judgment is not disfavored in antitrust cases. *See Camellia City Telecasters, Inc. v. Tribune Broadcasting Co.*, 762 F.Supp. 290, (D.Colo.1991).

## I. HUMANA HOSPITAL

### A. *Events*

In March, 1983, plaintiffs wrote to Humana Hospital and offered to provide around-the-clock obstetrical anesthesia services on a contractual basis. At that time, Anesthesia Associates, headed by anesthesiologist Dr. Peter Press (Press), was the single active group providing anesthesia services at Humana Hospital. Jeff Holland (Holland), the Executive Director of Humana Hospital, was actively soliciting proposals from anesthesia providers in an effort to stimulate competition with Anesthesia Associates, to expand coverage and to attract new obstetricians.

Holland contracted with anesthesiologists Dr. Copeland and Dr. Wyte, then members of the Metz Group, for 24-hour-a-day anesthesia services. The contract provided that Copeland and Wyte could subcontract with CRNAs. Under the contract, the CRNAs would be permitted to (1) monitor and reinject epidural anesthesia with a physician's order and (2) begin anesthesia for emergency cesarean sections at the discretion of the obstetrician and after consultation with the on-call anesthesiologist. Copeland and Wyte subcontracted with plaintiff CRNAs, who were then doing business as High Country and were independent contractors. The CRNAs were paid an hourly fee plus 45% of the amount billed to patients. Plaintiff CRNAs began providing anesthesia coverage on weekday nights in the fall of 1983.

Pursuant to then-existing hospital policy and Colorado law, the CRNAs were under the supervision of physicians when initiating epidural anesthesia. By the time performance of the contract began, Humana Hospital's policy on epidural placement by CRNAs was stricter than required by Colorado law. Humana Hospital policy, and its contract with Copeland and Wyte, required that in a nonemergency a physician anesthesiologist be present in the hospital during placement of an epidural by a CRNA. Supervision by a physician who was not an anesthesiologist was not permitted except in the case of an emergency. Eventually this policy was relaxed, so that surgeons who felt comfortable with supervising CRNA placement of epidural anesthesia and who were competent could do so without calling an anesthesiologist. There was never a requirement that CRNAs had to be supervised at all times.

The supervision rule, however strict, required that Wyte and Copeland alternate working after-hours on weekdays. Wyte and Copeland eventually terminated their contract with Humana Hospital because of the demanding workload and hours. Plaintiff CRNAs also gave termination notice. Holland, committed to the project, immediately began searching for another source for the 24–hour anesthesia service. He concluded that around-the-clock physician

supervision of the CRNAs was necessary to attract obstetricians and gynecologists. Because of the physical burden involved in 24–hour supervision of the CRNAs, Holland concluded that after-hour calls would have to be shared by both Anesthesia Associates, and Copeland and Wyte.

Consequently, a call schedule was drafted dividing the after-hours care between the two groups. The proposal was approved by Holland, the Chairman of the Ob/Gyn Department, the Chief of the Medical Staff, Press of Anesthesia Associates, Wyte and Copeland. The call schedule provided, among other things, that Anesthesia Associates, and Copeland and Wyte, would cooperate to assure that there was an anesthesiologist on call each night. Because there were five anesthesiologists on the medical staff, each was responsible for a weekday night. The on-call physician would either stay at Humana Hospital all night or provide in-house CRNA coverage from 6:00 p.m. to 7:00 a.m. CRNAs would handle emergencies when the on-call physician was not at the hospital. Humana Hospital would reimburse the on-call anesthesiologist $17.00 per hour for supervising CRNAs.

There was no language in the call schedule that would make it exclusive. The anesthesiologists and CRNAs were free to work at anytime when scheduled or requested by a surgeon. The only requirement was that the anesthesiologist on call was responsible to provide supervision that night. Plaintiffs assert, however, that it was exclusive in practice.

Initially, the CRNA plaintiffs covered for both Anesthesia Associates, and Copeland and Wyte. Thus, until the CRNAs severed their relationship with Anesthesia Associates, they covered the entire call schedule. Once the CRNAs broke relations with Anesthesia Associates and that group's three anesthesiologists, they covered only Copeland and Wyte. The CRNAs then saw their work schedule drop from five days per week to two days per week.

Wyte later moved from Colorado. Copeland took over Wyte's weekly on-call shift in addition to his own night. Later, Copeland too left the Metz Group. Plaintiffs contend that Copeland was forced to resign by other members of the Metz Group because Copeland used CRNAs rather than Metz Group members. Plaintiffs also contend that, to secure more work, the Metz Group circulated information that it was unethical for physicians to rely on CRNAs rather than anesthesiologists, and that a physician faced a greater risk of liability when using CRNAs.

From this, plaintiffs allege that the defendants conspired to restrain trade by fixing prices for anesthesiological services, allocating the market through the fee schedule and boycotting the CRNAs as a group. At oral argument and in their pleadings, plaintiffs disavow any independent claim for price fixing, market allocation or group boycott, arguing instead that their claim is based on "the totality of the conspiratorial acts of defendants...." Plaintiffs' Consolidated Memorandum at 59 (June 8, 1987).

**B.** *Defendants' Summary Judgment Motion*

Defendants contend that summary judgment is appropriate because (1) there is no unreasonable restraint of trade as the defendants do not wield sufficient market power, (2) there is no contract, combination or conspiracy as the evidence on which plaintiffs rely is consistent with, and does not negate, nonconspiratorial action and (3) the Metz Group and its members are not liable for the conduct of Anesthesiologists Copeland and Wyte.

1. Unreasonable Restraint of Trade: Market Power

Contending that I should apply rule of reason analysis, the defendants first argue that summary judgment is appropriate because they have no market power. Plaintiffs, on the other hand, assert that the alleged conspiracy involves acts that constitute per se violations of the Sherman Act. Both parties agree that the market force argument does not apply to per se violations of the Sherman Act. *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109–10, 104 S.Ct. 2948, 2964–65, 82 L.Ed.2d 70 (1984); *King &*

*King Enter. v. Champlin Petroleum Co.,* 657 F.2d 1147, 1152 (10th Cir.1981) (quoting *United States v. McKesson and Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956)), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). To justify the use of the per se rule, the challenged conduct must, by its nature, have a substantial potential for impact on competition. *Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, ———— & n. 15, 110 S.Ct. 768, 780–81 & n. 15, 107 L.Ed.2d 851, 872–73 & n. 15 (1990).

### a. *Per Se Violations Versus Rule of Reason*

I must be cautious in extending per se analysis "to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986).

> Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." [*Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)]. Certain categories of agreements, however, have been held to be per se illegal, dispensing with the need for case-by-case evaluation. We have said that per se rules are appropriate only for "conduct that is manifestly anticompetitive," [*Continental T.V.,* 433 U.S. at 50, 97 S.Ct. at 2557], that is, conduct " 'that would always or almost always tend to restrict competition and decrease output.' " [*Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289–90, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (quoting *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–

20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)) ].

*Business Elecs. Corp.,* 485 U.S. at 723, 108 S.Ct. at 1519.

After reviewing the undisputed facts, I cannot conclude that the circumstances surrounding the alleged conspiracy "make the likelihood of anti-competitive conduct so great as to render unjustified further examination of the challenged conduct." *National Collegiate Athletic Assn. v. Board of Regents,* 468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961–62, 82 L.Ed.2d 70 (1984). Although plaintiffs label the defendants' conduct as "price fixing," "market allocation" and "group boycott," traditionally per se violations, I look beyond plaintiffs' characterizations and scrutinize the factual underpinnings of the allegations. *See Northwest Stationers, Inc.,* 472 U.S. at 297, 105 S.Ct. at 2621; *Mid–West Underground Storage, Inc. v. Porter,* 717 F.2d 493, 496–98 & n. 2 (10th Cir.1983).

### i. Price Fixing

■ Price fixing is traditionally a per se violation. *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344–50, 102 S.Ct. 2466, 2473–76, 73 L.Ed.2d 48 (1982). Although plaintiffs do not allege an independent price fixing claim, they do allege that price fixing in violation of the Sherman Act was part of the conspiracy to restrain trade. Defendants contend that plaintiffs (1) do not provide sufficient evidence to show the existence of a conspiracy and (2) have no standing to make such a claim in any event.

The undisputed facts do not support the allegation that the defendants fixed prices. Plaintiffs claim that the anesthesiologists at Humana Hospital agreed on prices for anesthesia services. They assert that a fee schedule was agreed upon and incorporated in the call schedule. As evidence of this, plaintiffs first point to a proposed schedule prepared by Copeland, Wyte and Press at Holland's request. The proposal states in cryptic fashion "Epidural for labor—fixed fee." Plaintiffs also provide evidence that Copeland and Press discussed the price of epidural anesthesia in the Denver market. Press stated that $300.00 was reasonable in

the area. Copeland and Wyte subsequently raised their prices.

Defendants offer their testimony that they did not agree on any prices for epidural anesthesia. In response, plaintiffs provide the affidavit of plaintiff CRNA Konstantine Kalandros (Kalandros) recounting a discussion Kalandros had with Wyte just before Wyte's deposition. According to Kalandros, Wyte told Kalandros that Wyte and Copeland had both increased their fees, in the words of Kalandros, "to the level charged by D. Press and Anesthesia Associates," and that the proposed call schedule "represented an agreement between the same parties to charge fully for both procedures when a patient originally given an epidural anesthetic ... later required delivery by caesarean section." Plaintiffs contend that the Kalandros' affidavit establishes that there is a question whether the defendants agreed to fix prices.

Plaintiffs concede that the affidavit is hearsay under Federal Rule of Evidence 801, and do not argue that it falls within any exception. Thus, to the extent that plaintiffs wish to use the affidavit's description of Wyte's statements to prove the truth of their assertions, it is inadmissible.

■ Plaintiffs argue, however, that the affidavit is admissible to impeach Wyte's deposition testimony. Even if I assume that the affidavit is admissible for that limited purpose, however, it does not create a genuine fact question because plaintiffs cannot affirmatively rely on it to carry their burden of proving a price fixing conspiracy. *See Adams Parker Furniture, Inc. v. Ethan Allen, Inc.*, No. 86–2113–S (D.Kan. Dec. 17, 1987) (LEXIS Genfed library, Dist file).

■ The remaining evidence fails to establish the existence of a genuine issue of material fact. Defendants provide undisputed evidence that the phrase "Epidural for labor—fixed fee" meant only that a single fee would be charged regardless of the length of time the patient was in labor. It did not address the *amount* of the fee. *Drury Inn v. Olive Co.*, 878 F.2d 340, 343 (10th Cir.1989).

Press conveyed to Copeland his perception of a reasonable fee in the Denver area. There is no evidence, however, that he stated the amount of his fee. Nor is there evidence that he sought information on the others' rates. *See United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975).

At most, this evidence reflects a single one-way statement of a generic market datum. Even though Copeland and Wyte later raised their prices, plaintiffs provide no evidence that this decision was part of an agreement and not merely unilateral decisions to meet prevailing rates. "The antitrust plaintiff who relies on a theory of 'conscious parallelism' must establish that 'defendants engaged in consciously parallel action ... which was contrary to their economic selfinterest so as not to amount to good faith business judgment.'" *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) (omission in original) (quoting *Pan–Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981)).

■ Additionally, plaintiffs have no standing to assert the price fixing claim independently or as part of a larger conspiracy, even assuming that the defendants were price fixing. *See Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 908–12, 74 L.Ed.2d 723 (1983). The question of standing is one of law. *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 389 (10th Cir.1985). To resolve the question I consider, among other factors, the causal connection between the antitrust violations and plaintiffs' injuries. *Reazin v. Blue Cross and Blue Shield*, 899 F.2d 951, 962 n. 15 (10th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Here, plaintiffs can show no injury.

■ In order to have standing to assert a price fixing claim, plaintiffs must have suffered injury from that which makes the defendants' conduct unlawful. *See Atlantic Richfield Co. v. USA Petrole-*

**646**

*um Co.,* —— U.S. ——, ——–——, 110 S.Ct. 1884, 1889–92, 109 L.Ed.2d 333, 344–46 (1990). The plaintiffs must have suffered an "antitrust injury." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. This is an absolute requirement, not merely one of several factors. *See Central Nat'l Bank v. Rainbolt,* 720 F.2d 1183, 1186–87 (10th Cir.1983). Here, plaintiffs can make no such showing. Indeed, plaintiffs contend that the defendants fixed the prices above market. Because the fee-splitting arrangement with the plaintiffs provided that they would receive 45% of the amount billed to patients, plaintiffs actually benefited from any alleged above-market price fixing. *See Atlantic Richfield,* —— U.S. at ——, 110 S.Ct. at 1890–91, 109 L.Ed.2d at 345; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Consequently, the price fixing facet of the conspiracy allegation does not require application of the per se rule.

### ii. Market Allocation

■ Plaintiffs' market allocation allegation likewise does not require per se analysis. Although characterized as an allocation of the market, the parties agree that the call schedule was nonexclusive. Anesthesiologists were each assigned a weekday night on which to be on duty but did not prevent the other anesthesiologists and nurses from working nights for which they were not scheduled. This is not market allocation warranting application of the per se rule. "The essence of a market allocation violation ... is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Mid–West Underground Storage, Inc.,* 717 F.2d at 497–98 n. 2.

Here, the agreement does not provide that competition will cease. The uncontradicted testimony reveals that the anesthesiologists and CNRAs could and did provide services at the hospital even when not on call under the schedule. The schedule did not provide that the anesthesiologists would cease competing with one another. It provided only that the anesthesiologists would be available on certain nights. Plaintiffs provide no evidence that the

agreement was otherwise and no evidence that the call schedule was exclusive in operation.

Plaintiffs contend that even though the schedule was nonexclusive, as a practical matter it significantly reduced the opportunities of the CRNAs to provide anesthesia services. This was so, they contend, because no obstetrician would wait for a CRNA not on-call to arrive from elsewhere and a CRNA could not afford to stand-by waiting for an opportunity to provide services. Plaintiffs profess to evidence this assertion with deposition testimony of plaintiff Kalandros. The testimony cited, however, speaks only of displeasure with the supervision requirement and does not even address the call schedule. Furthermore, plaintiffs' assertion itself supports the proposition that in order to provide around-the-clock anesthesia coverage, a call schedule was needed to ensure the presence of one able to provide the service.

This arrangement is not "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality...." *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). It is not a naked restraint of trade with no purpose except stifling competition. Rather, it ensures that there is always anesthesia service available. *See Broadcast Music,* 441 U.S. 1, 99 S.Ct. 1551. Consequently, the allegation concerning the scheduling does not require per se analysis.

### iii. Group Boycott

■ Plaintiffs allege that defendants' conduct amounted to a group boycott which may be viewed as per se anticompetitive. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). A group boycott, however, is not always a per se violation. "Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *National Collegiate Athletic Assn. v. Board of Regents,* 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 2961–62 n. 26, 82 L.Ed.2d 70 (1984). Plaintiffs may not rely on a naked

allegation of group boycott, but must show that the defendants hold "market power or unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. at 2621; *see Indiana Fed'n of Dentists*, 476 U.S. at 458–59, 106 S.Ct. at 2017–18. This threshold requirement is not, of course, so burdensome as to subsume rule of reason analysis. *Broadcast Music*, 441 U.S. at 20 n. 33, 99 S.Ct. at 1562 n. 33.

██ As discussed below, plaintiffs make no showing that defendants have market power. Plaintiffs also do not even assert that defendants hold unique access to a business element necessary for effective competition. Consequently, plaintiffs fail to make the threshold showing necessary to invoke per se analysis.

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) is not to the contrary. There, attorneys refused court appointments to represent indigent defendants until compensation was increased. In that case, however, "overwhelming testimony" demonstrated that the group boycott, coupled with the price fixing, was far from harmless and "almost produced a crisis in the administration of criminal justice in the District...." 493 U.S. at ——, 110 S.Ct. at 782, 107 L.Ed.2d at 874. A threshold showing of market power was thus not necessary in that case. 493 U.S. at —— n. 19, 110 S.Ct. at 782 n. 19, 107 L.Ed.2d at 874 n. 19. Here, in contrast, plaintiffs can make no price fixing claim as a component of the alleged group boycott and fail to otherwise make a threshold showing precluding rule of reason analysis. I decline to force the defendants' conduct into the "boycott" pigeonhole and invoke the per se rule. *See Indiana Fed'n of Dentists*, 476 U.S. at 456, 106 S.Ct. at 2016–17; *Drury Inn*, 878 F.2d at 343.

Thus, I conclude as a matter of law that the challenged conduct does not have a substantial potential for impact on competition. I hold that the alleged conspiracy involves acts that do not constitute per se

violations. Consequently, I apply the rule of reason.

### b. *Rule of Reason and Market Power*

"[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc'y of Professional Eng'rs*, 435 U.S. at 691, 98 S.Ct. at 1365; *see Smith Mach Co. v. Hesston Corp.*, 878 F.2d 1290, 1298 (10th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990). The factfinder must "decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Maricopa County Medical Soc'y*, 457 U.S. at 343, 102 S.Ct. at 2472. In making that decision "a variety of actual market factors must be examined. *Smith Mach Co.*, 878 F.2d at 1298 (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918)). The plaintiff bears the burden of proving the 'adverse effect on competition.' " *Smith Mach. Co.*, 878 F.2d at 1298 (quoting *Jefferson Parish Hosp., No. 2 v. Hyde*, 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984)). As the above statements indicate, the adverse impact must be on *competition*, not on any individual competitor or on plaintiff's business. *See Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir.1986), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988); *Christofferson Dairy v. MMM Sales*, 849 F.2d 1168, 1172 (9th Cir.1988). Additionally, "we must bear in mind that the purpose of the antitrust laws is the promotion of consumer welfare.... [W]e consider [defendant's] refusal to deal in light of its effect on consumers, not on competitors." *Westman Comm'n Co.*, 796 F.2d at 1220 (citations omitted). *Reazin*, 899 F.2d at 960 (emphasis and modifications in original).

One method to show a detrimental effect on consumers and competition is to establish that the defendants had market power. Defendants contend that, using the market share as defined by plaintiffs, they treated

at most only 5.8% of the patients receiving hospital care in the Denver metropolitan area. This market share, defendants argue, is too low as a matter of law to warrant application of the federal antitrust laws.

■ Plaintiffs concede that the defendants have minimal market share. Although market share is not always the only consideration when evaluating market power, *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819, 824 (10th Cir.1987), lack of any significant market share at least raises the presumption of de minimis market power. *Reazin*, 899 F.2d at 967. The only evidence relevant to market share that I find or that was cited by the parties is the undisputed 5.8%.

Plaintiffs show no other evidence to indicate the level of market power possessed by defendants. Aside from conclusory pleading that defendants' conduct impeded the ordinary give and take of the market place, plaintiffs provide no evidence that defendants possessed market power.

■ Plaintiffs also contend that, even if the defendants do not have market power, they still have a valid section one claim. An elaborate analysis of market power is unnecessary where a defendant's conduct (1) amounts to "a naked restriction on price or output," or (2) actually causes a detrimental effect on competition. *Indiana Fed'n of Dentists*, 476 U.S. at 460–61, 106 S.Ct. at 2018–19; *Reazin*, 899 F.2d at 968 n. 24. I conclude that the conduct here does not amount to a naked restraint on price and output. Plaintiffs have ample opportunity to provide anesthesia services outside the hospital. Some limitation in providing such services at Humana Hospital does not show a naked restraint on trade.

Thus, in order to avoid summary judgment on this issue, plaintiffs must show that the defendants' conduct "had an adverse impact on competition." *Key Financial Planning Corp.*, 828 F.2d at 642. It is not enough that plaintiffs were prevented from providing services. " 'The consumer does not care how many sellers of a particular good or service there are; he cares

only that there be enough to assure him a competitive price and quality.' " *Key Financial Planning Corp.*, 828 F.2d at 642 (quoting *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 664 (7th Cir.1982)).

Plaintiffs provide the preliminary and final report of their expert witness. The expert concludes that defendants' conduct limited the number of anesthesia procedures available for patients and doctors, and decreased the level of price competition in the geographic area. Defendants provide evidence that the conduct actually fostered competition by raising the standard of anesthesia care, attracting new doctors and increasing the number of patients.

Defendants argue that plaintiffs' expert report is not credible in light of their undisputedly low market share and that it is insufficient to generate an issue of material fact. I agree that the report is conclusory and, were this in a context other than an expert report, it would be inadequate. *See Lujan*, — U.S. at ——, 110 S.Ct. at 3188, 111 L.Ed.2d at 716. I am not prepared, however, to hold in this Rule 56 context that conclusory opinions contained in an expert's report are subject to the same limitations as lay opinion in an affidavit. *See* Fed.R.Evid. 704(a).

At oral argument, defendants also contended that the expert report has little probative value because it is "implausible and inconsistent with the record evidence." *Matsushita*, 475 U.S. at 594 n. 19, 106 S.Ct. at 1360 n. 19. The report is certainly inconsistent with other evidence, but it is not so lacking in colorable predicates to be void of probative value. *See Matsushita*, 505 F.Supp. 1313, 1356–63 (E.D.Pa.1980), *aff'd in part and rev'd in part*, 723 F.2d 238 (3d Cir.1983), *rev'd*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although I entertain a serious doubt that plaintiffs establish a genuine question of fact whether defendants' conduct had an actual anticompetitive effect from the perspective of the consumer so as to excuse their failure to show market power, for the purpose of this opinion, I will nevertheless

assume that they do. Consequently, I assume that plaintiffs meet their burden of establishing the existence of a genuine dispute whether defendants unreasonably restrained trade.

### 2. Conspiracy: Independent Action

To maintain this section one claim, however, plaintiffs must also show that the defendants conspired. Plaintiffs must provide significant probative evidence that the defendants did not act independently.

> In other words, if the evidence is as consistent with permissible independent business interests as with an illegal conspiracy, then the plaintiff fails to create a fact issue on the existence of a conspiracy *unless* the ambiguity is negated by evidence tending to exclude the possibility that the defendants were pursuing independent interests.

*Key Financial Planning Corp.*, 828 F.2d at 639 (emphasis in original); *see Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir.1987).

### a. *Ambiguity*

Defendants contend that the evidence of conspiracy is ambiguous because it is consistent with unilateral conduct in pursuit of permissible independent business purposes. Such evidence, by itself, does not support an inference of antitrust conspiracy. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984). Plaintiffs argue that the evidence is not ambiguous. Thus, no inquiry into the potential independent business rationale for the alleged conduct is necessary.

#### i. Call Schedule

First, defendants contend that the nonexclusive call-schedule was adopted as part of Humana Hospital's efforts to ensure around-the-clock anesthesia coverage. It ensured that the burden of after-hours duty would be shared. Second, defendants contend that Holland's request to define hospital policy for CRNA supervision was an effort to ensure that the hospital met prevailing community standards for anesthesia care. Third, as discussed above, defendants assert that plaintiffs are unable

to maintain a price fixing claim. In sum, defendants argue that the call schedule and supervision policy were part of an overall attempt, not to restrain trade, but to enhance the hospital's obstetrical practice. The defendants do not argue that the supervision requirement was necessary for patient safety; rather they argue that the policy enhances the hospital's image and overall profitability in the field of obstetrics.

Plaintiffs argue that the call schedule itself, the drafting of the schedule by Press and the several meetings held in Holland's office constitute sufficient evidence of a conspiracy to allocate the market. With that unambiguous evidence of a "contract, combination or conspiracy," plaintiffs argue that there is no need to further investigate whether the defendants were pursuing permissible business interests independently.

As discussed above, however, the call schedule was nonexclusive. Furthermore, when the schedule was adopted, plaintiffs covered 100% of the call. The undisputed evidence establishes that the schedule did not divide the market, but ensured that at least one anesthesiologist was available at all times during night hours. The existence of the call schedule cannot be characterized accurately as "significant probative evidence." Evidence of meetings in Holland's office, alone, is ambiguous at best.

#### ii. Other Evidence

Plaintiffs also contend that there is other unambiguous evidence of a conspiracy. Specifically, they contend that Metz Group members (1) met repeatedly to discuss methods by which they could deprive plaintiffs of cases at Humana Hospital, (2) discouraged Dr. Copeland from assigning cases to plaintiffs by expelling him from the Metz Group, (3) embarked upon a propaganda campaign with surgeons and obstetricians at Humana Hospital and (4) voted with Press and the two affiliated physicians in Anesthesia Associates to require anesthesiologist supervision of CRNAs when initially placing an epidural.

First, plaintiffs provide minutes showing that the Metz Group met and discussed

CRNA at Humana Hospital. The minutes indicate that the Metz Group was not contented with the call schedule and was searching for a plan to increase the number of patients it served. The minutes do not indicate, however, that the Metz Group or its members agreed to any improper aim. At most, they establish that competition between the Metz Group and the CRNAs was thriving. Likewise, the deposition of Wyte, upon which plaintiffs rely, does nothing to support the contention that the Metz Group was conspiring to eliminate unlawfully CRNA competition. Thus, this evidence is ambiguous.

Second, the evidence does not support the assertion that Copeland was expelled from the Metz Group because he refused to comply with a conspiracy to unreasonably restrain trade. Although it is undisputed that the Metz Group was unhappy with Copeland's use of CRNAs, the evidence is equally clear that the Metz Group was concerned that Copeland's billing practice was unethical and potentially illegal. The Metz Group's lawyer had advised that Copeland's billing practices violated Medicare regulations and could expose the Metz Group to liability. This is certainly consistent with "permissible independent business interests." Plaintiffs provide no evidence that Copeland was discharged from the Metz Group in an effort to restrain the use of CRNAs. Again, the alleged conduct, asking Copeland to leave the Metz Group, is ambiguous evidence of a conspiracy.

Third, the evidence does not support the assertion that the Metz Group conspired to restrain trade through scare tactics and a propaganda campaign. The evidence shows only that two members of the Metz Group, Stevens and Caputo, circulated a position statement of the American Society of Anesthesiologists and expressed their view that an anesthesiologist should not be in charge of supervising multiple CRNAs while the anesthesiologist is working on another patient. This evidence is consistent with the desire to maintain a high level of practice at Humana Hospital: when an anesthesiologist is busy with one patient, the anesthesiologist may be unable to effectively supervise CRNAs with other patients. As such, it is ambiguous as evidence of a conspiracy. This evidence may support the inference that the two Metz Group members were hostile toward CRNAs. Hostility, however, does not equate with conspiracy. *See Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir.1990); *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1406–07 (9th Cir.1986).

Fourth, plaintiffs allege that the Metz Group's affirmative vote to require anesthesiologist supervision of CRNA initial placement of the epidural is unambiguous evidence of conspiracy. The defendants, however, articulate permissible independent business reasons for this requirement. First, the requirement is consistent with the stated desire to provide a high standard of care. Second, the requirement is consistent with the stated desire to attract new physicians and patients to its obstetrics department and do not appear to be a modification of existing Humana Hospital policy. Additionally, the guidelines on which the Metz Group members voted were essentially the same as those contained in the contract between Humana Hospital, and Copeland and Wyte. Furthermore, those guidelines were not even approved by the Medical Executive Committee.

I conclude that the evidence of a conspiracy, taken as a whole in the light of all the circumstances, is ambiguous. The entire course of conduct by the defendants is consistent with the pursuit of permissible independent business purposes.

### b. *Negating Evidence of Independent Interest*

■■■ Plaintiffs fail to provide evidence of conspiracy that is unambiguously inconsistent with the pursuit of permissible independent business interests. Consequently, the burden rests on plaintiffs to provide evidence that tends to exclude the possibility that the alleged conduct was in furtherance of nonconspiratorial objectives. *Dreiling v. Peugeot Motors*, 850 F.2d 1373, 1379 (10th Cir.1988); *Key Financial Planning Corp.*, 828 F.2d at 639. Plaintiffs fail

to meet this burden. Indeed, other than the unsupported assertions that "the explanations by defendants concerning quality of care and adequate coverage do not ring true," and that the "anesthesiologists all acted in a manner contrary to their own economic interests," Plaintiffs' Supplemental Response at 20 & 22 (Nov. 27, 1988), plaintiffs rely solely on the bald argument that the evidence of conspiracy is not ambiguous. This is not sufficient. *See Gibson,* 818 F.2d at 725.

I hold that although under the rule of reason plaintiffs may establish a question of fact whether defendants' conduct had an adverse effect on competition, they fail to establish a genuine question whether the defendants conspired and were not pursuing permissible independent business interests. Summary judgment is appropriate on plaintiffs' Sherman Act section one claim concerning Humana Hospital. Because I grant the defendants' motion for summary judgment on this basis, I need not address their argument that the Metz Group and its members are not liable for the alleged anticompetitive conspiracy of Copeland and Wyte.

## II. St. Luke's Hospital

### A. *Events*

In February, 1986, plaintiff CRNAs were employed by St. Luke's Hospital. St. Luke's experienced incidents involving a lack of anesthesia coverage during emergencies on the obstetrical deck. The chairman of the OB/GYN department, Dr. Faust (Faust), and obstetrician/gynecologist Dr. Richard Porreco (Porreco) discussed the shortage with Donald Lenz (Lenz), the head administrator for St. Luke's. Upon the request of Lenz, Carol Julian (Julian), an assistant administrator of nurse anesthesia at St. Luke's, prepared a plan for concurrent twenty-four-hour coverage of the obstetric deck and ambulatory surgery. Faust and Porreco also sought a proposal from the CRNAs. Plaintiff CRNA Raymond Golden (Golden) presented his proposal to Faust and Porreco.

Lenz and Julian both saw Golden's proposal. Faust and Porreco testified at deposition that Golden's proposal was not what they wanted. Lenz did not adopt Golden's proposal. Later, the Metz Group presented its proposal. St. Luke's declined to adopt that as well. Likewise, Julian's proposal was never implemented. Finally, an additional CRNA was placed on the ambulatory deck during the time when most ambulatory cases were scheduled.

Plaintiffs contend that the rejection of Golden's proposal was the result of pressure by Metz Group members on the administration at St. Luke's. As evidence of this, plaintiffs point to Julian's comparison of possible solutions. One of the alternative solutions was similar to Golden's yet-to-be-presented plan in that it contained a "fee-for-service" provision. Julian rejected that alternative partially because it would have a "negative effect on CRNAs/physician anesthesia relation." Plaintiff Deposition Exhibit 7. Plaintiffs contend that pressure from the Metz Group anesthesiologists created this concern.

Plaintiffs also point to a quarrel between Metz Group member Dr. Fisher and Porreco. According to plaintiffs, Fisher was angry about being called to an emergency and assignment only on high risk, complex cases. Plaintiffs contend that during Fisher's argument with Porreco, Fisher threatened that continued support of the CRNAs would undermine anesthesiologist support. Likewise, plaintiffs argue that Dr. Joseph Verbrugge (Verbrugge) of the Metz Group was angry when told of Golden's proposal and threatened retaliation against the CRNAs.

From this, plaintiffs allege that the defendants conspired to restrain trade through a group boycott. As was made clear at oral argument, the essence of the claim as to St. Luke's is that the actions of the defendants caused the St. Luke's administration to reject Golden's proposal and continue to limit the CRNAs' status.

### B. *Defendants' Summary Judgment Motion*

Defendants contend that summary judgment is appropriate because (1) there is no

unreasonable restraint of trade as the defendants do not wield sufficient market power, (2) there is no contract, combination or conspiracy as the evidence on which plaintiffs rely is consistent with, and does not negate, nonconspiratorial action and (3) plaintiffs lack standing to assert a section one claim with respect to St. Luke's.

### 1. Unreasonable Restraint of Trade: Market Power

Defendants repeat their market power argument initially presented as to Count One (Humana). The analysis concerning Humana applies here as well.

It is undisputed that St. Luke's treats less than five percent of all hospital patients in Metro Denver and the Metz Group anesthesiologists make up less than five percent of the anesthesiologists in their geographical area of practice. As I held earlier in this opinion, I may consider the degree of market power only if the conduct alleged does not constitute a per se violation of the Sherman Act. *Supra* Part I(B)(1). I conclude that I should evaluate the conduct here under the rule of reason.

#### a. *Per Se Violations Versus Rule of Reason*

Plaintiffs allege that defendants' conduct constitutes a group boycott. Assuming that this is true, however, that does not alone warrant per se analysis. *Supra* Part I(B)(1)(a)(iii). As I held previously, plaintiffs have the burden to go beyond alleging group boycott and show that the defendants possess "market power or unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. at 2621. Plaintiffs make no such showing. Consequently, I apply rule of reason analysis.

#### b. *Rule of Reason and Market Power*

Defendants argue, as they did with regard to Humana, that their market share is too low as a matter of law to warrant application of the federal antitrust laws. Plaintiffs rely on their expert witness report to establish that defendants' alleged conduct had an anticompetitive effect. For the reasons previously stated, although I have serious doubt that the report estab-

lishes a material issue of fact, for the purposes of this opinion, I nevertheless assume that it does. Consequently, I assume that plaintiffs meet their burden of establishing the existence of a genuine dispute whether defendants unreasonably restrained trade.

### 2. Conspiracy: Independent Action

Defendants also argue that plaintiffs fail to provide significant probative evidence to show a conspiracy and that defendants did not act independently. I employ the same analysis I used earlier to determine if plaintiffs meet their summary judgment burden. *See supra* Part I(B)(2). First, I determine whether the evidence is as consistent with permissible independent business interests as with an illegal conspiracy. If I conclude that it is, I then look to see if plaintiffs present evidence negating the ambiguity by excluding the possibility that the defendants were pursuing independent interests.

#### a. *Ambiguity*

■ There is little in the record to indicate that the rejection of Golden's proposal was due in part or in whole to defendants' actions. The defendants offer five reasons why the administration at St. Luke's did not adopt the plan: (1) it may have violated federal wage and labor laws; (2) it could not be implemented in time to address the immediate crisis; (3) the fee-for-service component could cause a conflict of interest because the CRNAs working for a fee would also work as employees; (4) St. Luke's potential liability could increase; and (5) the alteration of the status quo could cause unwanted disruption. There is no evidence of any other reason for St. Luke's rejection of Golden's proposal. Consequently, the evidence is ambiguous at best and plaintiffs bear the burden of providing evidence tending to negate these permissible independent reasons.

#### b. *Negating Evidence of Independent Interest*

There is insufficient record support for the inference that Metz Group members influenced St. Luke's administration regarding Golden's proposal. Porreco's un-

disputed testimony is that he never considered the argument with Fisher as a threatened boycott. Indeed, there is evidence that even if Fisher intended to threaten St. Luke's, he was without the resources to carry through with a boycott. Furthermore, the Metz Group anesthesiologists never refused to provide services to St. Luke's. Testimony from St. Luke's administrators shows that the decision not to adopt Golden's proposal was not in response to pressure from the anesthesiologists. The Metz Group members' plan had yet to be born when St. Luke's rejected Golden's plan. Indeed, the Metz Group plan was later rejected as well. The evidence overwhelmingly supports the conclusion that St. Luke's acted unilaterally in adopting its own solution to the problem of anesthesia shortage on the obstetrical deck.

Again, although under the rule of reason plaintiffs may establish a question of fact whether defendants' conduct had an impact on competition, they fail to establish a genuine question whether the defendants conspired and were not pursuing permissible independent business interests. Summary judgment is thus appropriate on plaintiffs' St. Luke's Hospital claim.

Because the defendants prevail on the first two prongs of their argument, I need not labor over the question of standing.

## III. St. Mary's-Corwin Hospital

### A. *Events*

In June, 1986, CRNA plaintiff Kalandros developed a proposal for a twenty-four hour obstetric epidural program at St. Mary's–Corwin Hospital (St. Mary's) in Pueblo. He had provided nurse anesthesia services to St. Mary's since August, 1983. Kalandros presented the proposal to St. Mary's administrator William Turman (Turman) and Samuel Duhon (Duhon), chairman of St. Mary's anesthesia department. In August, 1986, Duhon told Kalandros of the hospital's decision to terminate negotiations for extended CRNA support. St. Mary's also sought the services of Kalandros less often, and eventually stopped calling Kalandros for his services altogether.

Plaintiffs contend that St. Mary's ceased the negotiations because of threats and intimidation from Metz Group members. Specifically, plaintiffs contend that Duhon spoke with defendant Verbrugge at a meeting of the Colorado Society of Anesthesiologists (CSA). Duhon had heard of the original complaint filed by plaintiffs here and asked Verbrugge about the case. Plaintiffs contend that Verbrugge's response caused Duhon to terminate negotiations with Kalandros. From this, plaintiffs allege that the Metz Group and its members conspired to restrain trade by causing St. Mary's to cease negotiating for extended CRNA anesthesia coverage.

### B. *Defendants' Summary Judgment Motion*

Defendants again contend that summary judgment is appropriate because (1) there is no unreasonable restraint of trade as the defendants do not wield sufficient market power and (2) there is no contract, combination or conspiracy because the evidence on which plaintiffs rely is consistent with, and does not negate, nonconspiratorial action.

#### 1. Unreasonable Restraint of Trade: Market Power

The defendants repeat their market power argument. I evaluate the conduct here under the rule of reason as plaintiffs do not show that the defendants possess "market power or unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. at 2621.

Plaintiffs continue to rely on their expert witness report to establish that defendants' alleged conduct had an anticompetitive effect. Once again, although I have serious doubt that the report establishes a genuine issue of fact, for the purposes of this opinion, I nevertheless assume that it does. Consequently, I assume that plaintiffs meet their burden of establishing the existence of a genuine dispute whether defendants unreasonably restrained trade.

#### 2. Conspiracy: Independent Action

Defendants again argue that plaintiffs fail to provide significant probative evidence to show a conspiracy. I employ the

same analysis I used earlier to determine if plaintiffs make a sufficient evidentiary showing. *See supra* Parts I(B)(2) & II(B)(2).

#### a. *Ambiguity*

The evidence of a conspiracy is ambiguous. Although plaintiffs contend that Metz Group members pressured St. Mary's to cease contract negotiations with Kalandros, it is at least equally plausible on the record here that St. Mary's terminated the discussions with Kalandros because plaintiffs filed this suit and not because of any conduct by the defendants. Plaintiffs do not contend that this reason is not a permissible independent interest. Consequently, plaintiffs bear the burden of providing evidence tending to negate this permissible reason.

#### b. *Negating Evidence of Independent Interest*

Plaintiffs fail to provide any admissible evidence showing that Metz Group or its members influenced St. Mary's to terminate the contract discussions with Kalandros. Plaintiffs rely solely on the affidavits of plaintiff Kalandros, plaintiff McGlothlen and plaintiff Oswald.

##### i. Plaintiffs' Affidavits

Plaintiffs rely on various cryptic statements to show that St. Mary's was pressured by the defendants to terminate contract negotiation. Plaintiffs admit that these statements are hearsay but argue that they fall under the state of mind exception to the hearsay rule. Fed.R.Evid. 803(3).

■ Plaintiffs rely on *Hydrolevel Corp. v. American Soc'y of Mechanical Eng'rs, Inc.*, 635 F.2d 118, 128 (2d Cir.1980), *aff'd*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), where the Second Circuit affirmed the trial court's admission of a hearsay statement for the limited purpose of showing consumers' state of mind. The trial court did not, however, admit the evidence to prove the truth of the matter asserted. Under *Hydrolevel*, the statements remain inadmissible to prove the truth of the matter asserted. *See MCI Communications Corp. v. American Tele. & Tele. Co.*, 708 F.2d 1081, 1141 (7th Cir.1983), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Thus, the statements do nothing to show that the defendants engaged in any conduct to influence the administration of St. Mary's to terminate the contract negotiations. I also reject plaintiffs argument that the statements are admissible for impeachment purposes. *See Adams Parker Furniture, Inc. v. Ethan Allen, Inc.*, No. 86–2113–S (D.Kan. Dec. 17, 1987) (LEXIS Genfed library, Dist file).

■ I further decline to consider the statements under the catch-all exception to the hearsay rule. Fed.R.Evid. 803(24). First, the statements are so obscure as to have little probative value to show that the Metz Group or its members pressured St. Mary's administrators. Second, the sources of the affidavits are named plaintiffs in this action who would gain materially by the admission of the hearsay. Third, Duhon, not a party to this action, denies ever delivering the statements attributed to him. Deposition of Duhon at 70–71. (Feb. 24, 1987). Fourth, at the time Copeland allegedly made the statement attributed to him, he was not a member of the Metz Group. I conclude that the statements have an insufficient guarantee of trustworthiness. The general purposes of the evidentiary rules and the interests of justice would not be served by admission of the hearsay statements.

##### ii. Defendants' Evidence

Defendants offer much evidence that Duhon's decision to terminate the contract negotiations was independent of conduct by the defendants. Although the evidence shows that Duhon spoke with Verbrugge during the CSA meeting, the evidence is uncontroverted that Verbrugge, on advice of his counsel, refused to supply information about the case. Deposition of Verbrugge at 225 (Sept. 12, 1986); Deposition of Duhon at 15–16, 21–24, 27–28, 30, 33–34, 84 (Feb. 24, 1987); *see* Deposition of Kalandros at 110 (Oct. 1, 1986).

Indeed, the undisputed evidence is that the only relevant statement Verbrugge made to Duhon at the CSA meeting con-

cerning plaintiffs was that the CRNAs were very capable anesthetists. Deposition of Verbrugge at 225 (Sept. 12, 1986); Deposition of Duhon at 35 (Feb. 24, 1987). The only evidence is that Duhon ceased negotiating with Kalandros and called Kalandros in less frequently because Kalandros and the other plaintiffs had filed the instant action. Deposition of Duhon at 29, 38 (Feb. 24, 1987); Deposition of Turman at 14–15, 23–24, 31–32 (Feb. 24, 1987). Undisputed evidence overwhelmingly supports the conclusion that St. Mary's acted unilaterally in ceasing contract negotiations with Kalandros.

Although under the rule of reason plaintiffs may establish a question of fact whether defendants' conduct had an impact on competition, they fail to establish a genuine question whether defendants conspired and were not pursuing permissible independent business interests. Summary judgment is appropriate on plaintiffs' St. Mary's Hospital claim.

Defendants seek sanctions pursuant to Federal Rule of Civil Procedure 11 against plaintiffs for raising the St. Mary's claim. Rule 11 provides that I shall impose sanctions upon a party that, after reasonable inquiry, files a claim not well grounded in fact. Although I conclude that summary judgment is appropriate on Plaintiff's St. Mary's claim, after reviewing the record and the briefs on the sanctions motion I conclude that sanctions are not appropriate.

Accordingly, IT IS ORDERED that

(1) The motion for summary judgment filed by defendants the Metz Group, David Heisterkamp, Joseph Verbrugge, Steven Caputo, and Ronald Stevens on Count One of the amended complaint filed by plaintiffs The Anesthesia Advantage, Inc., Konstantine Kalandros, Scott McGlothlen, G. Edward Oswald, and Raymond Golden is GRANTED;

(2) The motion for summary judgment filed by defendants the Metz Group, David Heisterkamp, Joseph Verbrugge, Steven Caputo, and Ronald Stevens on Count Four of the amend-

ed complaint filed by plaintiffs The Anesthesia Advantage, Inc., Konstantine Kalandros, Scott McGlothlen, G. Edward Oswald, and Raymond Golden is GRANTED;

(3) The motion for summary judgment filed by defendants the Metz Group, David Heisterkamp, Joseph Verbrugge, Steven Caputo, and Ronald Stevens on Count Six of the amended complaint filed by plaintiffs The Anesthesia Advantage, Inc., Konstantine Kalandros, Scott McGlothlen, G. Edward Oswald, and Raymond Golden is GRANTED;

(4) The motion for sanctions filed by defendants the Metz Group, David Heisterkamp, Joseph Verbrugge, Steven Caputo, and Ronald Stevens on Count Six of the amended complaint filed by plaintiffs The Anesthesia Advantage, Inc., Konstantine Kalandros, Scott McGlothlen, G. Edward Oswald, and Raymond Golden is DENIED;

(5) Defendants the Metz Group, David Heisterkamp, Joseph Verbrugge, Steven Caputo, and Ronald Stevens are awarded their costs.