BEAL CORP. LIQUIDATING TRUST, successor to Beal Corp., f/k/a Beacon Laboratories, Inc., a Minnesota Corporation, Plaintiff,

v.

VALLEYLAB, INC., a Colorado Corporation, Defendant.

Civil Action No. 94–B–2480.

United States District Court, D. Colorado.

May 16, 1996.

Thomas P. McMahon, Musgrave & Theis, Denver, CO, R. Gregory Stutz, Charles A. Miller, Paul G. Urtz, Stutz and Miller, Denver, CO, for plaintiff.

Theodore S. Halaby, Halaby Cross Liechty, Schluter & Buck, Denver, CO, Joseph A. Tate, Christine C. Levin, Dechert Price & Rhoads, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Colorado Antitrust Act, C.R.S. §§ 6–4–104 and 6–4–105 (1992 Repl.

Vol.), plaintiff BEAL Corp. Liquidating Trust (successor to BEAL Corp., formerly known as Beacon Laboratories, Inc.) (Beacon) brings antitrust claims against defendant Valleylab, Inc. (Valleylab). Beacon also alleges three state law claims: breach of contract, promissory estoppel, and breach of a covenant of good faith and fair dealing. Supplemental jurisdiction exists over Beacon's state law claims pursuant to 28 U.S.C. § 1367(a). It is undisputed that Colorado law applies to Beacon's state contract based claims. Both Valleylab and Beacon manufactured and sold electrosurgical devices during the years relevant to this action.

Beacon asserts seventeen different claims for relief. Claims one and eight allege that Valleylab engaged in a horizontal group boycott of Beacon's products. Claims two and nine contend that Valleylab participated in a horizontal market allocation scheme. Claims three, four, ten and eleven argue that Valleylab created tying arrangements between products it controlled and products it had no right to control. Claims five and twelve allege that Valleylab monopolized a market of surgical devices. Claims six and thirteen contend that Valleylab attempted to monopolize a market of surgical devices. Claims seven and fourteen argue that Valleylab conspired to monopolize a market of surgical devices. Claims fifteen, sixteen, and seventeen allege breach of contract, promissory estoppel, and breach of covenant of good faith and fair dealing, respectively.

Valleylab moves to dismiss all of Beacon's claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief can be granted. Valleylab makes the following arguments in its motion to dismiss: (1) Valleylab obtained a valid patent license which exempts its alleged activities from antitrust scrutiny; (2) Beacon fails to allege an actionable conspiracy to violate antitrust laws; (3) Beacon fails to allege Valleylab acted willfully; and (4) Beacon's state law claims do not state claims upon which relief can be granted.

Valleylab also moves for summary judgment with respect to Beacon's seventeen claims. Valleylab makes the following contentions in its motion for summary judgment: (1) Valleylab obtained a valid patent license which exempts its alleged activities from antitrust scrutiny; (2) Beacon's first tying arrangement claim is invalid as a matter of law; (3) the record contains no evidence establishing that Beacon has been injured; and (4) the record contains no genuine issues of material fact with regard to any of Beacon's claims.

Plaintiff Beacon moves for partial summary judgment: Beacon requests an order of summary judgment declaring the invalidity of Beacon's asserted patent law defense. Beacon also moves to amend its complaint pursuant to Fed.R.Civ.P. 15(a). The parties have fully briefed each motion and presented argument on relevant issues.

## I. BACKGROUND

This controversy involves the manufacture and sale of electrosurgical devices. Electrosurgery is the process of performing surgery by utilizing an electrical current to coagulate blood at the situs of an incision. At issue is an electrosurgical device which relies on ionized argon gas to create an electrical current. The electrical current and argon gas flow from a base unit to a hand-held instrument which the surgeon points at tissue. This hand-held instrument resembles a pencil and is called a "handpiece" in the surgical industry. Surgeons hold the handpiece approximately one or two centimeters from the target tissue. The swift stream of argon gas forces away fluid and debris from the incision, providing a relatively clean tissue surface on which the electric energy coagulates blood. The argon gas, having been ionized by the electricity, emits a visible beam of light. Because the beam of light allows the operator to see exactly where the combination of gas and electricity will flow, the operator can use the instrument in a precise manner.

In the 1970's, Valleylab became the first company to obtain a patent for argon beam coagulation. Valleylab obtained separate patents for a base unit and handpiece. In 1989, Birtcher Medical Systems, Inc. (Birtcher) entered the argon beam coagulation market by acquiring United States Patent No. 4,781,175 from Bard Electro Medical Systems, Inc. (Bard). The United States issued Patent No. 4,781,175 based on Bard's im-

proved design for a base unit. Beacon entered the market in 1989 when it began manufacturing and marketing argon beam coagulation devices after applying for patents based on improved designs. The primary manufacturers of argon beam coagulation devices in 1990 were Valleylab, Birtcher, and Beacon. Each company sold argon beam coagulation base units as well as handpieces.

In 1990, Birtcher sued Beacon in this federal district court, alleging that Beacon's base unit infringed upon Patent No. 4,781,175 (Case No. 90–B–432). After a two week trial, a federal jury concluded that Beacon's clients had been using Beacon's base unit in a manner that infringed Birtcher's patent. In order to prevent Beacon from contributorily infringing Birtcher's patent, Beacon was enjoined on December 27, 1991 from selling its base unit and from selling its handpieces for use with any Beacon base unit. Beacon, however, was permitted to sell its handpieces for use with Valleylab and Birtcher base units. While Beacon continued to manufacture and sell handpieces for use with Valleylab and Birtcher base units, the injunction made Birtcher and Valleylab the sole remaining manufacturers of base units.

After the injunction, Beacon discussed with Birtcher the possibility of the sale of Beacon's assets to Birtcher. These negotiations terminated when Valleylab and Beacon executed a letter of intent to negotiate a requirements contract for Valleylab's purchase of Beacon handpieces. Beacon and Valleylab executed this letter of intent in December of 1991. Also in December of 1991, Valleylab loaned $400,000 to Beacon to meet certain expenses and obligations. In consideration for the loan, Beacon executed a promissory note, offered its base unit and handpiece patents to Valleylab as collateral, and terminated its negotiations with Birtcher. The letter of intent terminated by its terms in February of 1992.

Unable to agree on a requirements contract, Beacon and Valleylab entered into an interim distribution agreement in March of 1992. The interim distribution agreement ran through the end of 1992 and automatically renewed in annual increments unless terminated. The interim distribution agreement provided for termination by either party, by written notice, provided notice was given at least ninety days in advance of the annual renewal date. Pursuant to this interim agreement, Valleylab purchased handpieces worth $1,100,000.00 during November and December of 1992.

Concurrent with its execution of the interim distribution agreement, Valleylab sued Birtcher, alleging that Birtcher infringed upon Valleylab's patents and seeking to invalidate Birtcher's Patent No. 4,781,175. In August of 1992, Valleylab and Birtcher entered into a patent litigation settlement agreement which also serves as a patent license agreement. Pursuant to this agreement which serves as the crux of Beacon's antitrust claims, Valleylab became a licensee of Birtcher's Patent No. 4,781,175. The agreement limited Valleylab's purchases of handpieces from outside sources to 30,000 units prior to February of 1993 and, thereafter, prohibits Valleylab's purchase of handpieces from outside sources altogether. Valleylab purchased no more than 30,000 units from Beacon before the end of 1992, and terminated negotiations with Beacon regarding a requirements contract.

In February of 1993, Beacon repaid the $400,000 loan it had received from Valleylab with interest. On March 1, 1993, Beacon sold substantially all of its assets to Birtcher. As part of this asset sale, Beacon covenanted not to sue Birtcher. BEAL filed this suit against Valleylab on October 31, 1994, as Beacon's successor in interest.

## II. STANDARDS FOR MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

### A. Motion to Dismiss

■ For purposes of a motion to dismiss, I accept all factual allegations as true and resolve all reasonable inferences in favor of the plaintiffs. *Tri–Crown, Inc. v. American Federal Sav. & Loan Ass'n*, 908 F.2d 578, 582 (10th Cir.1990). A case should not be dismissed for failure to state a claim unless I determine that Beacon can prove no set of facts which would entitle it to relief. *Id.*

### B. Motion for Summary Judgment

Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992).

Once the moving party makes a properly supported summary judgment motion, the opposing party may not rest on the allegations contained in its complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. If a movant establishes entitlement to judgment as a matter of law given uncontroverted, operative facts contained in the documentary evidence, summary judgment is appropriate. *Mares*, 971 F.2d at 494. While the district court views evidence in a light most favorable to the party opposing the motion, that party must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Summary judgment in antitrust cases is generally disfavored. *City of Chanute, Kansas v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir.), cert. denied, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). However, "allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment." *Key Financial Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 638 (10th Cir.1987).

### III. VALLEYLAB'S PATENT LAW DEFENSE

Section 1 of the Sherman Act states, in part: "Every contract, combination · in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Beacon asserts three types of claims based on section 1 of the Sherman Act: (1) horizontal group boycott; (2) horizontal market allocation; and (3) tying arrangements. Beacon also alleges that Valleylab has violated section 2 of the Sherman Act, which states, in part: "[it is a violation of the antitrust laws to] monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2.

Valleylab argues that all of Beacon's antitrust claims should be dismissed because the Birtcher–Valleylab licensure agreement does not violate any antitrust laws. Valleylab does not deny that the Birtcher–Valleylab license agreement imposes handpiece purchase restrictions on Valleylab. Instead, Valleylab defends the license agreement by arguing that Birtcher was within its patent rights when it imposed those purchase restrictions on Valleylab. Valleylab contends that the Birtcher–Valleylab patent license agreement is entitled to a patent exception to the antitrust laws.

The validity of Valleylab's asserted patent law defense is a key threshold issue. If the patent law defense proves valid, Valleylab may not be subject to liability for its execution of the Birtcher–Valleylab patent license. Furthermore, three separate motions require resolution of this issue: Valleylab's motion for summary judgment, Beacon's motion for partial summary judgment, and Valleylab's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). I conclude that Valleylab cannot

avail itself of the asserted patent law defense.

■ Generally, exemptions from the antitrust laws are strictly construed and strongly disfavored. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421, 106 S.Ct. 1922, 1929, 90 L.Ed.2d 413 (1986). Courts, however, have consistently recognized an implied and limited "patent" exception to the antitrust laws. *See Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98 (1964) (stating that patent laws which confer a monopoly on making, using and selling an invention "are in pari materia with the antitrust laws and modify them pro tanto"). "The patent is itself a government grant of monopoly and is therefore an exception to usual antitrust rules." 3 AREEDA & TURNER ¶¶ 704–707, at 117–45. The patent exception not only resolves conflicting rights, but assumes that "exposing patent activity to wider antitrust scrutiny would weaken the incentives underlying the patent system, thereby depriving consumers of beneficial products." *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1186 (1st Cir.1994) (citing *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir.1981), cert. denied, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982)).

■ Nevertheless, the exercise of a patent privilege does not immunize concerted and contractual behavior that threatens competition. When a patentee seeks to expand its monopoly by misuse or fraud, the patentee exceeds the patent exception to antitrust laws. *See U.S. v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir.1981); *see also Brownell v. Ketcham Wire & Mfg. Co.*, 211 F.2d 121, 129 (9th Cir.1954) (improper practices in connection with patents include use of invalid patents in price fixing, cross-licensing of patents, attempts to extend the scope of patent monopoly, illegal price fixing activities in connection with patents, tieing patents to unpatented devices or processes, and seeking to extend the effect of an expired patent).

Valleylab relies on *Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980), in support of its contention that the licensing agreement is a valid exercise of Birtcher's patent rights.

In *Dawson*, Rohm and Haas owned a patent for the process of applying a chemical herbicide to rice fields. The chemical itself was an unpatented, nonstaple commodity that had no other use except as an herbicide for rice fields. Dawson Chemical manufactured and sold the chemical herbicide to rice farmers with instructions to apply the chemical in accordance with the Rohm and Haas process patent. Rohm and Haas filed suit against Dawson Chemical alleging that Dawson Chemical had contributorily infringed upon its process patent by selling the herbicide to farmers who directly infringed upon the process patent. Dawson Chemical raised the defense of patent misuse, claiming that Rohm and Haas had refused to grant patent licenses and attempted to tie the sale of patent licenses to sales of the unpatented chemical.

Prior authority held that any attempt to control the market for unpatented goods constituted patent misuse, even if those goods had no use outside a patented invention. *See, e.g., Mercoid Corp. v. Mid–Continent Inv. Co.*, 320 U.S. 661, 665–66, 64 S.Ct. 268, 271–72, 88 L.Ed. 376 (1944). Overruling these cases, *Dawson* held that Congress gave patentees a limited power to exclude others from competition in nonstaple goods by enacting section 271 of the 1952 Patent Act. *Dawson* at 213, 100 S.Ct. at 2621–22. The staple-nonstaple distinction ensures that a patentee may only affect the market for its own patent.

Beacon and Valleylab disagree on the proper definition of a "nonstaple" good. Beacon argues that a nonstaple good is a component product, "the unlicensed sale of which would constitute contributory infringement." (Beacon Brf. in Support of Motion for Partial Summ. Judgment at 8, (citing *Dawson*, 448 U.S. at 186 n. 6, 100 S.Ct. at 2608 n. 6).) Valleylab defines a nonstaple good less narrowly, arguing that the proper definition of a nonstaple good is an unpatented article which has "no substantial use except through practice of the patented method." (Valleylab Brf. in Opp. to Beacon's Motion for Partial Summ. Judgment at 11 (citing *Dawson*, 448 U.S. at 199, 100 S.Ct. at 2614).) The definitions offered by Beacon

and Valleylab differ substantially and compel two different results under the facts of this case.

Beacon's interpretation of *Dawson* appears the most reasonable. After an exhaustive analysis of legislative history surrounding the adoption of section 271, the Supreme Court states:

> .. by enacting §§ 271(c) and (d), Congress granted to patent holders a statutory right to control *nonstaple goods that are capable only of infringing use in a patented invention,* and that are essential to that invention's advance over prior art.

*Dawson* at 213, 100 S.Ct. at 2622 (emphasis added). Patent holders, therefore, may not control staple goods. Nor may patent holders control nonstaple goods that are capable of non-infringing use with a patented invention.

Beacon argues that its sale of handpieces for use with Birtcher and Valleylab base units does not contributorily infringe on Birtcher's base unit patent. Beacon directs my attention to the December, 1991 injunction issued in the Birtcher–Beacon litigation which specifically held that Beacon could continue to sell its handpieces for utilization with Birtcher and Valleylab base units. The order enjoining Beacon from engaging in certain selling activities cites *Dawson* for the general proposition that "the essence of a patent grant is the right to exclude others from profiting by the patented invention." *Dawson* at 215, 100 S.Ct. at 2623. The applicability of 35 U.S.C. §§ 271(c) and (d), however, was not at issue in the Birtcher–Beacon patent litigation.

Implicit in that injunction is the following rationale. Electrosurgeons use Beacon's handpiece in conjunction with Birtcher and Valleylab base units without infringing directly on Birtcher's base unit patent. Where direct infringement does not exist, there can be no contributory infringement. *Dawson* at 188, 100 S.Ct. at 2609. Because Beacon's sale of its handpieces for use with Birtcher and Valleylab base units does not infringe on Birtcher's base unit patent, the handpiece is capable of non-infringing use. 35 U.S.C. § 271 provides a patentee the limited right to control nonstaple goods that are capable only of infringing use. *Dawson* at

213, 100 S.Ct. at 2621–22. Birtcher, therefore, does not have a statutory right to control the market for handpieces. Consequently, Valleylab cannot avail itself of section 271.

Because Valleylab cannot rely on section 271 and has not argued that any other patent legislation exempts the Birtcher–Valleylab license agreement from antitrust scrutiny, Valleylab has not established that Beacon cannot prevail on its antitrust claims. Accordingly, I do not dismiss Beacon's antitrust allegations for failure to state claims upon which relief may be granted.

Application of the patent defense here is a question of law. No genuine issue of material fact exists with regard to the availability of a patent law defense derived from 35 U.S.C. § 271. Beacon is entitled to summary judgment on this issue. Fed.R.Civ.P. 56(c). I grant plaintiff's motion for partial summary judgment on the issue of Valleylab's asserted patent law defense. I limit the grant of plaintiff's motion for partial summary judgment, however, to this issue: whether Valleylab may assert a patent law defense based on the 1952 Patent Act, 35 U.S.C. § 271. Valleylab is not precluded from asserting other patent law defenses that may exist.

Valleylab's motion for summary judgment reiterates the same arguments regarding the applicability of 35 U.S.C. § 271 as a patent law defense to Beacon's horizontal boycott and tying arrangement claims (claims one, three, eight and ten). For the reasons stated above, Beacon has shown that 35 U.S.C. § 271 does not provide a patent defense to Valleylab as a matter of law. I therefore deny Valleylab's motion for summary judgment on this issue.

## IV. VALLEYLAB'S MOTION TO DISMISS

Aside from its patent law defense, Valleylab asserts different grounds upon which certain claims of Beacon should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). I discuss these grounds separately. Beacon's state antitrust claims (claim eight—horizontal boycott, claim nine—horizontal market allocation, and claims ten to fourteen—monopolization) mirror its federal antitrust claims and, for purposes of this analy-

sis, I look to federal court interpretations of federal antitrust laws. *See Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F.Supp. 1503, 1516 (D.Colo.1992), aff'd 13 F.3d 366 (10th Cir.1993).

### A. Failure to Allege an Actionable Conspiracy

Beacon's first, second, third, and fourth claims allege that Valleylab violated section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a horizontal group boycott, a horizontal market allocation scheme, and two tying arrangements. Beacon's seventh claim contends that Valleylab conspired to restrain trade in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Section 1 of the Sherman Act prohibits "[e]very *contract, combination ... or conspiracy,* in restraint of trade or commerce among the several States...." 15 U.S.C. § 1 (1988) (emphasis added). Under section 2 of the Sherman Act, "[it is a violation of the antitrust laws to] ... *combine or conspire* with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2 (1988) (emphasis added). Both sections 1 and 2 of the Sherman Act, therefore, prohibit conspiracies to restrain trade.

Valleylab argues that Beacon's claims fail to allege an actionable conspiracy. Valleylab contends that Birtcher, by virtue of its probable success in the patent infringement litigation with Valleylab, "forced" Valleylab to discontinue purchases of handpieces from Beacon. Valleylab argues that Birtcher acted unilaterally and that there can be no conspiracy without two actors.

Valleylab relies, in part, on *Systemcare, Inc. v. Wang Laboratories, Inc.*, 787 F.Supp. 179 (D.Colo.1992), for the proposition that unilateral action by a company cannot violate Section 1 of the Sherman Act. In *Systemcare,* the plaintiff claimed that a computer manufacturer had improperly required customers to purchase its hardware maintenance services in order to obtain its software support services. The plaintiff claimed that the manufacturer and its customers had conspired to restrain trade because the customers had acquiesced in the allegedly improper contract. Plaintiff's claims were dismissed for failure to state an actionable conspiracy

between two actors, because a business may unilaterally announce the terms by which it will deal. *Systemcare* at 182. *Systemcare,* however, is inapposite to this case. In *Systemcare,* the plaintiff alleged that the computer manufacturer conspired with consumers of its product. Here, Beacon alleges that Valleylab, as a manufacturer, conspired with Birtcher, an independent manufacturer, to restrain trade.

Section 1 of the Sherman Act, by its language, does not prohibit solely unilateral conduct, regardless of its anti-competitive effects. *City of Chanute,* 955 F.2d at 650. Beacon's complaint, however, clearly alleges a conspiracy to restrain trade or commerce between two actors: Birtcher and Valleylab. Beacon specifically points to the licensing agreement entered into by Birtcher and Valleylab which restricts Valleylab's ability to purchase handpieces from outside sources. The fact that Beacon pursues only one of the contracting parties does not limit its ability to obtain relief. Accordingly, I conclude that claims 1–4, 7, 8–11, and 14 should not be dismissed for failure to allege a conspiracy to restrain trade or commerce between two or more actors.

### B. Failure to Allege Willful Anti-Competitive Conduct

Beacon's fifth and sixth claims allege that the Birtcher–Valleylab license agreement constitutes unlawful monopolization or attempted monopolization by Valleylab in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1988). Valleylab argues that Beacon fails to allege Valleylab willfully engaged in anti-competitive conduct, an essential element of monopolization or attempted monopolization. 15 U.S.C. § 2 (1988).

Section 2 of the Sherman Act prohibits monopolies in interstate trade or commerce. Section 2 provides, in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2 (1988). Both a monopolization claim and an attempt to monopolize claim require the plaintiff to al-

lege that the defendant specifically intended to attain monopoly power. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Contrary to Valleylab's assertions, Beacon's complaint does not concede that Birtcher "forced" the patent license restriction on Valleylab. Nor does Beacon's complaint fail to allege willful anti-competitive conduct by Valleylab. Accordingly, I do not dismiss Beacon's monopolization and attempted monopolization claims for failure to allege willful or intentional conduct.

### C. Breach of Contract

 Valleylab moves for dismissal of Beacon's breach of contract claim for failure to allege necessary elements. The elements of a breach of contract claim in Colorado are: (1) existence of a contract; (2) performance by plaintiff or some justification for nonperformance; (3) failure to perform the contract by defendants; and (4) damages to plaintiff. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992). Beacon's complaint sufficiently alleges the existence of the interim distribution contract, Valleylab's failure to perform that contract, a justification for Beacon's nonperformance, and damages to Beacon from the alleged breach. Accordingly, I deny Valleylab's motion to dismiss Beacon's breach of contract claim.

### D. Duty of Good Faith and Fair Dealing

Beacon's seventeenth claim alleges that Valleylab breached its duty of good faith and fair dealing when Valleylab terminated the interim distribution contract. Valleylab argues that Colorado law does not impose a duty of good faith and fair dealing on parties to a contract that contains a termination-at-will clause.

 Colorado law implies a duty of good faith and fair dealing on both parties to a contractual arrangement. *See Colorado Nat. Bank of Denver v. Friedman*, 846 P.2d 159, 172 (Colo.1993). The underlying contract, however, must be valid for the implied duty of good faith and fair dealing to adhere to the relationship. *Farris v. ITT Cannon, a Div. of ITT Corp.*, 834 F.Supp. 1260, 1268 (D.Colo.1993) (applying Colorado law). Colorado courts, however, are generally unwilling to incorporate a covenant of good faith and

fair dealing into at-will contracts. *See Friedman & Son, Inc. v. Safeway Stores, Inc.*, 712 P.2d 1128 (Colo.App.1985) (exercise of the right to terminate an at-will contract will does not state a claim upon which relief can be granted); *Farmer v. Central Bancorporation, Inc.*, 761 P.2d 220, 222 (Colo.App.1988) (employer's termination of an at-will employment contract does not violate a covenant of good faith and fair dealing); *see also Montoya v. Local Union III of the Intern. Broth. of Elec. Workers*, 755 P.2d 1221, 1225 (Colo.App.1988). Beacon's complaint concedes that the interim distribution agreement contained a bargained-for option to cancel upon 90 days written notice.

 Fairly construed, Beacon's complaint alleges that Valleylab failed to properly terminate the interim distribution agreement. While the proper termination of an at-will contract does not state a claim upon which relief can be granted, an allegation of improper termination of such an agreement does allege an actionable claim. *Friedman & Son, Inc. v. Safeway Stores, Inc.*, 712 P.2d 1128 (Colo.App.1985). Accordingly, I deny Valleylab's motion to dismiss Beacon's breach of implied duty of good faith and fair dealing claim.

### E. Promissory Estoppel

Beacon's sixteenth claim alleges that Valleylab is liable under a theory of promissory estoppel. Valleylab contends that Beacon's claim for promissory estoppel must be dismissed because it fails to allege that Beacon's reliance was justifiable. I disagree.

 In *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983), the Colorado Supreme Court adopted the principles articulated by section 90(1) of the Restatement (Second) of Contracts. That section provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

RESTATEMENT (SECOND) OF CONTRACTS § 90(1). "The doctrine of promissory estoppel encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise." *Kiely* at 767.

The complaint alleges that Valleylab promised Beacon that it would structure a favorable deal with Beacon if Beacon terminated its buy-out discussions with Birtcher. The complaint sufficiently alleges a promise, reliance, and detriment, and thus states a claim upon which relief can be granted. *See Rosales v. AT & T Information Systems, Inc.*, 702 F.Supp. 1489 (D.Colo.1988). Accordingly, I conclude that Beacon's claim for promissory estoppel should not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

## V. VALLEYLAB'S MOTION FOR SUMMARY JUDGMENT

In addition to Valleylab's motion to dismiss, Valleylab also moves for summary judgment on Beacon's complaint pursuant to Fed.R.Civ.P. 56. The claims are discussed separately. As stated above, the analysis of the federal antitrust claims shall be dispositive for the state antitrust claims (claims eight through fourteen). *See Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F.Supp. 1503, 1516 (D.Colo.1992), aff'd 13 F.3d 366 (10th Cir.1993).

### A. Beacon's First and Eighth Claims for Relief: Horizontal Group Boycott

Beacon's first claim alleges that Valleylab violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1988), by engaging in a horizontal group boycott of Beacon handpieces. Beacon alleges that Valleylab and Birtcher, two suppliers of argon coagulation surgical devices, conspired and contracted to boycott Beacon products. Valleylab contends that it is entitled to summary judgment on Beacon's first and eighth claims because Beacon fails to show per se unlawful conduct by Valleylab.

In the seminal case of *Standard Oil Co. of New Jersey v. U.S.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court interpreted section 1 of the Sherman Act to prohibit contracts or actions which the common law had deemed to constitute "undue restraints of trade or which, as a result of changing times and economic conditions, would prove unreasonable." *Id.* at 59–60, 31 S.Ct. at 515–16. This came to be known as the "rule of reason."

As a general rule, courts subject horizontal boycotts to per se antitrust analysis and vertical arrangements to the rule of reason. *M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 978 (1st Cir.1984). In a classic horizontal group boycott, independent businesses at the same market level agree to boycott another business, also at the same level of distribution. *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir.1982). The rule of reason does not apply to acts, which by "their necessary effect and the character of the parties by whom they were made," are clearly restraints of trade and thus per se violations of section 1 of the Sherman Act. *Standard Oil* at 65, 31 S.Ct. at 517. Actions are per se illegal when their "pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957).

Beacon has demonstrated that genuine issues of material fact exist with regard to the existence of a horizontal boycott agreement. To establish that a group boycott is per se illegal in this Circuit, "there must be an agreement among conspirators whose market positions are horizontal to each other." *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1224 n. 1 (10th Cir.1986). "While the competitors need not be at the same market level as the plaintiff, there must be concerted activity between two or more competitors at same market level." *Key Financial*, 828 F.2d at 641. Beacon submits a 1993 operating plan of Valleylab and Valleylab's March 6, 1992 Phase 1 business plan as proof that Valleylab considered Birtcher to be its main competitor. Valleylab's business plan contains the following sub-heading and discussion:

COMPETITION

There are currently two other businesses manufacturing argon systems: Birtcher and Beacon.

. . . . .

At this time, there have been no other entries into the marketplace nor is there any indication of additional entries.

(Beacon Brf., Second Generation Handpiece Business Plan of 3/6/92, Tab D at 7.) As proof of concerted activity between two or more competitors, Beacon cites the Birtcher–Valleylab patent license agreement. (Valleylab Brf., Birtcher–Valleylab Patent License Agreement of 8/21/92, Tab 31.) Whether this patent license agreement constitutes a horizontal boycott agreement is an issue of fact for the jury to decide. Contrary to Valleylab's assertions, I need not resolve the question of whether these claims withstand the rule of reason analysis. Beacon's horizontal group boycott claims clearly allege per se antitrust violations. Per se antitrust violations need not pass scrutiny under the rule of reason test. *Key Financial,* 828 F.2d at 641. I deny Valleylab's motion for summary judgment on Beacon's first and eighth claims.

**B. Beacon's Second and Ninth Claims for Relief: Horizontal Market Allocation**

Beacon's second claim alleges that Birtcher and Valleylab agreed to divide the handpiece market by allocating to Valleylab the sales of handpieces for use with its base units and allocating to Birtcher the sale of handpieces for use with its base units. Valleylab argues that Beacon has no standing to bring a market allocation claim and that the record contains no evidence of a market allocation scheme.

■ Horizontal market allocation constitutes a per se violation of section 1 of the Sherman Act whether or not accompanied by price-fixing. *U.S. v. Topco Associates, Inc.,* 405 U.S. 596, 608–09, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Smalley & Co. v. Emerson & Cuming, Inc.,* 13 F.3d 366 (10th Cir.1993). To establish a violation, Beacon must show that Valleylab and Birtcher entered into an agreement with each other to allocate the relevant market.

■ Both Beacon and Valleylab direct my attention to the deposition of William Maya, an executive at Birtcher. Maya testi-fied that he had suggested to William Reichenberg, an executive of Valleylab, that Birtcher and Valleylab should stop selling accessories for use with each other's argon coagulators. (I Valleylab Brf., Depo. of Maya, Tab 5 at 20–21.) This conversation took place prior to the Birtcher–Valleylab litigation. Maya testified that he made this suggestion in an attempt to avert potential litigation. (Depo. of Maya at 21.) Reichenberg and Maya both testified that, after consultation with Reichenberg's attorney, they abandoned the ideas of cross-licensure and market allocation. (I Valleylab Brf., Depo. of Reichenberg, Tab 10 at 157–58, 169; Depo. of Maya at 21.) Maya further testified that neither he nor Reichenberg suggested the possibility of such an allocation scheme again. (Depo. of Maya at 21.) Letters and miscellaneous notes made contemporaneously with these discussions support testimony of Maya and Reichenberg. (Beacon Brf., Misc. Notes and Documents, Tabs W and X; Beacon Brf., Ltr. From Reichenberg to Maya of 1/15/92, Tab Y at 1.)

Beacon argues that circumstantial evidence raises a genuine issue of material fact as to whether a market allocation scheme exists. Beacon points to the conversations between Maya and Reichenberg, the amount of direct contact between Birtcher and Valleylab executives, and the Birtcher–Valleylab patent license agreement.

■ Circumstantial evidence can serve to create the existence of a genuine issue of material fact in an antitrust case. *See Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1361 (10th Cir.1989). The direct and circumstantial evidence presented by both parties creates a genuine issue of material fact with regard to Beacon's horizontal market allocation claims.

■ Valleylab also argues that Beacon does not have standing to bring a horizontal market allocation scheme claim. Plaintiffs seeking damages under section 4 of the Clayton Act must have both standing and antitrust injury. *City of Chanute,* 955 F.2d at 652 n. 14; *see also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986). "While the two concepts are closely linked, they are

nonetheless distinct." *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406 (10th Cir.), cert. denied, 506 U.S. 974, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992).

The Supreme Court has enumerated six factors to be considered in evaluating standing for antitrust claims: "(1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury—i.e., whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment." *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir.1995) (citing *Sharp,* 967 F.2d at 406–07).

Valleylab argues that Beacon, even after execution of the Birtcher–Valleylab license agreement, could still sell its handpieces directly to customers or through its own distribution network. Beacon, however, has identified portions of depositions which create genuine issues of fact as to whether the Birtcher–Valleylab license agreement was but a single component of a protracted scheme to allocate the market for surgical handpieces. (*See* Depo. of Maya, Tab 5 at 20–21.) Beacon does not rely exclusively on the Birtcher–Valleylab license agreement as evidence of a horizontal market allocation scheme.

The evidence in the record viewed favorably to Beacon shows that the Birtcher–Valleylab agreement and other conduct of Valleylab is the proximate cause of some antitrust injury to Beacon. The Birtcher–Valleylab agreement occasioned the breakdown of competitive market conditions in the sale of argon handpieces. Beacon participated in this market.

Furthermore, Beacon's injury is causally linked to the alleged anticompetitive conduct of Valleylab. Beacon and Valleylab constituted two of the three competitors in the relevant market. The Birtcher–Valleylab patent license, while not expressly designating Beacon as the target of a purchase restriction, clearly impacted only Beacon.

Beacon and Valleylab executives interacted more than occasionally. Beacon and Valleylab were contracting entities engaged in extensive business negotiations.

Beacon's injury is the type of injury antitrust laws intend to prevent. The federal antitrust laws seek to prevent manufacturers and sellers of products from exiting the market. After Beacon's exit from the handpiece market, Valleylab base unit customers could look only to Valleylab to purchase argon handpieces. Beacon clearly has standing to assert a horizontal market allocation claim. Because genuine issues of material fact exist with regard to this claim and because Beacon has standing, I deny Valleylab's motion for summary judgment with respect to Beacon's horizontal market allocation claims.

### C. Beacon's Third, Fourth, Tenth, and Eleventh Claims for Relief: Tying Arrangements

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different product.... Such an arrangement violates section 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.' " *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461–62, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) (quoting *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969) (citations omitted)). Three elements constitute a tying claim: (1) purchases of the tying product must be conditioned upon purchases of a distinct tied product; (2) the actor must possess sufficient power in the tying market to compel acceptance of the tied product; and (3) the arrangement must foreclose to competitors of the tied product a substantial volume of commerce. *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 (10th Cir.1995) (citing *Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 957 (10th Cir.1986) (citations omitted)).

Beacon asserts two separate tying theories in its complaint. First, Beacon al-

leges in its third and tenth claims that Valleylab tied the sale of Patent No. 4,781,175 to the Birtcher–Valleylab patent license agreement. This assertion is nonsensical. Neither Patent No. 4,781,175 nor the patent license agreement are products. Beacon's allegation of a positive tie between Patent No. 4,781,175 and the Birtcher–Valleylab patent license agreement fails in the absence of proof that these items are products. Furthermore, the registered patentee of Patent No. 4,781,175 is Birtcher, not Beacon. By definition and, as a matter of law, Beacon had no power in the market of the tying "product," Patent No. 4,781,175. While Valleylab became a licensee under Patent No. 4,781,175, Valleylab had no authority to create additional licensees. I therefore grant Valleylab's motion for summary judgment with respect to Beacon's third and tenth claims.

■ Beacon's second tying arrangement theory alleges that Valleylab conditioned the purchase of its argon beam coagulators on the purchase of Valleylab argon handpieces (fourth and eleventh claims for relief). As proof of the tying arrangement, Beacon produces the affidavit of Owen R. Phillips, Ph. D., Professor of Economics at the University of Wyoming. Mr. Phillips speculates:

> Despite the fact that Beacon had marketed two different adapters that enabled its handsets to be used with Valleylab GSU and Birtcher ABC coagulators, neither Valleylab nor Birtcher has developed an adapter enabling its handpieces to be used with the other's coagulators. The latter *may be the result of a tacit agreement, previously discussed between Valleylab and Birtcher, not to sell one's argon handpieces to the other's coagulator customers.* That conclusion is buttressed by the fact that at one point Valleylab had, but then dropped, a project to develop an adapter to enable its handpieces to be used with Birtcher's coagulator customers. Also, Birtcher acquired Beacon's technical capability to produce adapters that fit Valleylab GSU coagulators. Apparently such adapters were never produced by Birtcher and no Beacon handpieces were sold by Birtcher to fit Valleylab coagulators. The net result of the anti-competitive conduct of Valleylab and Birtcher has been to force

end-users of argon beam coagulators and argon handpieces to purchase only the handpieces of the same entity whose particular coagulator they have previously purchased.

(II Valleylab Brf., Aff. of Phillips, Tab 45 at 9.) Beacon submits no other proof, in the form of affidavits, documents, depositions, or otherwise, to demonstrate that Valleylab tied sales of *any* base unit to the sale of its handpieces. Dr. Phillips' unsubstantiated and speculative conclusion that a tacit agreement between Valleylab and Birtcher exists to create a tying arrangement creates no genuine issues of material fact.

Likewise, a reasonable jury could infer nothing sinister from Valleylab's business decision to forego production of handpieces capable of use with Birtcher coagulators. The record shows that Valleylab tried to create an adapter to allow use of Valleylab handpieces with Birtcher coagulators, but the experiment failed when handpieces exploded. (I Valleylab Brf., Depo. of Johnson, Tab 4 at 77–78.)

■ Finally, the record discloses no proof that Valleylab coerced consumers to accept such an arrangement. When the record contains no evidence of customer coercion, summary judgment is appropriate on a tying arrangement claim. *Data General,* 36 F.3d at 1181. Accordingly, I grant Valleylab's motion for summary judgment with respect to Beacon's fourth and eleventh claims.

### D. Beacon's Fifth and Twelfth Claims for Relief: Monopolization

■ Beacon alleges that Valleylab monopolized the market for argon surgical handpieces. Section 2 of the Sherman Act prohibits monopolies in interstate trade or commerce. 15 U.S.C. § 2 (1988). A monopoly claim requires proof of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of the power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1704 (cited with approval by *TV Communications Network,*

*Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir.1992)).

 . The first issue, therefore, is the definition of the relevant market. Beacon contends that the relevant market is composed of Valleylab argon handpieces. Beacon's complaint claims that "Valleylab and Birtcher each individually possesses a monopoly over its own respective sub-market (*i.e.,* that for the production of argon handpieces compatible for use domestically with its own respective GSU or ABC argon beam coagulators); . . . ." (Complaint ¶ 82(b).) Beacon's definition of the relevant market is self-defeating, for Valleylab obviously owns 100% of the market share for sales of handpieces compatible with Valleylab base units. Once Beacon exited the marketplace, there can be no genuine dispute that no other company manufactured handpieces for use with Valleylab's base unit.

 Valleylab is incapable of monopolizing the relevant market as defined by Beacon. A company does not violate section 2 of the Sherman Act "by virtue of the natural monopoly it holds over its own product." *TV Communications,* 964 F.2d at 1025 (citing *U.S. v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956)). Consequently, Beacon has not shown the existence of a monopoly.

 Even if Beacon defined the relevant market as domestic sales of argon handpieces in general, as it does for its other section 2 Sherman Act claims, Beacon has not shown that Valleylab possesses a monopoly over sales of argon handpieces. The record illustrates that Valleylab, because its handpieces are incompatible with Birtcher coagulators, possesses at most 12% of the market share for handpiece sales in 1992. (I Valleylab Brf., Depo. of Johnson, Tab 4 at 77–78; II Valleylab Brf., 1991 Valleylab Preliminary Sales Forecast, Tab 43 at V04069.) Lack of a significant market share "raises the presumption of de minimis market power . . ." *Anesthesia Advantage v. The Metz Group,* 759 F.Supp. 638, 648 (D.Colo.1991). Valleylab is entitled to judgment on Beacon's fifth and twelfth claims as a matter of law.

### E. Beacon's Sixth and Thirteenth Claims for Relief: Attempt to Monopolize

 A claim for attempt to monopolize requires proof of four elements: "(1) relevant market (including geographic market and relevant product market); (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 885 F.2d 683, 693 (10th Cir.1989), cert. denied, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990).

 Beacon's attempt to monopolize claim defines two separate relevant markets. First, Beacon defines the relevant market as the sale of Valleylab argon handpieces compatible with Valleylab base units. For the reasons stated above in the analysis of Beacon's monopolization claim, a company does not violate section 2 of the Sherman Act "by virtue of the natural monopoly it holds over its own product." *TV Communications,* 964 F.2d at 1025 (citing *E.I. du Pont,* 351 U.S. at 393, 76 S.Ct. at 1006). Consequently, Beacon must rely on the alternative definition of the relevant market stated in its complaint: sale of argon handpieces "compatible for use domestically with argon beam coagulators generally." (Complaint ¶ 84(a).)

 Valleylab argues that nothing in the record demonstrates a dangerous probability of success in monopolizing this market. Indeed, the Birtcher–Valleylab patent license agreement, by itself, contains nothing which creates a dangerous probability of monopolization by Valleylab. (I Valleylab Brf., Depo. of Johnson, Tab 4 at 77–78.) Valleylab could increase its market share under only two circumstances: first, Valleylab could develop and sell handpieces compatible with Birtcher base units; second, Valleylab could increase its market share by selling more of its own base units. The record shows Valleylab had failed in previous attempts to develop and sell handpieces compatible with Birtcher base units. The Birtcher–Valleylab patent license agreement does not, by its terms, increase Valleylab's market share for sales of coagulator base units. (I Valleylab Brf.,

Birtcher–Valleylab Patent License Agreement of 8/21/92, Tab 31.)

To establish a dangerous probability of success of attempted monopolization, Beacon must show more than proof of intent to monopolize. "The purpose of [section 2 of the Sherman Act] is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 891–92, 122 L.Ed.2d 247 (1993).

Once the moving party makes a properly supported summary judgment motion, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson,* 622 F.2d at 519; Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. While I view the evidence in a light most favorable to Beacon, Beacon does not identify sufficient evidence which would require submission of this claim to a jury. Beacon has failed to show a genuine issue of material fact exists with regard to the probable success of monopolization by Valleylab. Valleylab, therefore, is entitled to summary judgment on Beacon's sixth and thirteenth claims for relief.

### F. Beacon's Seventh and Fourteenth Claims for Relief: Conspiracy to Monopolize

To establish a claim for conspiracy to monopolize in violation of section 2 of the Sherman Act, a plaintiff must prove facts sufficient to support four elements: (1) "the existence of a combination or conspiracy to monopolize"; (2) "overt acts done in furtherance of the combination or conspiracy"; (3) "an effect upon an appreciable amount of interstate commerce"; and (4) "a specific intent to monopolize." *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 438 (10th Cir.), cert. denied, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). A relevant mar-

ket need not be established. *Salco Corp. v. General Motors Corp., Buick Motor Div.,* 517 F.2d 567, 576 (10th Cir.1975).

Valleylab argues that no genuine issue of material fact exists with respect to Valleylab's specific intent to monopolize. Beacon identifies the Birtcher–Valleylab patent license as evidence of an overt act done in furtherance of a conspiracy. (Valleylab Brf., Birtcher–Valleylab Patent License Agreement of 8/21/92, Tab 31.)

Beacon also directs my attention to various other acts which, it believes, show Valleylab's intent to monopolize. William Goslau of Beacon testified at his deposition that Birtcher did not want to have Beacon handpieces in the marketplace. (Beacon Brf., Depo. of Goslau, Tab PP at 155–60). Mr. Goslau also testified that, contemporaneous with Birtcher–Valleylab licensing negotiations, Walt Williams of Valleylab told Beacon management that Birtcher desired to stop Beacon from selling handpieces on its own. (Depo. of Goslau, Tab PP at 157.)

Lastly, Beacon argues that Valleylab's execution of the Birtcher–Valleylab license agreement, Valleylab's subsequent termination of a relationship with Beacon, and Valleylab's failure to sell Beacon handpieces it had already purchased from Beacon demonstrates Valleylab's specific intent to monopolize. Such conduct creates a genuine issue of fact. "Unfair" or "predatory" conduct may be sufficient to prove intent to monopolize. *Spectrum Sports,* 506 U.S. at 458, 113 S.Ct. at 891–92 (1993). I therefore deny Valleylab's motion for summary judgment with respect to Beacon's seventh and fourteenth claims.

### G. Antitrust Damages

Three of Beacon's antitrust claims remain intact following my analysis of Valleylab's summary judgment arguments: (1) horizontal group boycott (Beacon's first and eighth claims); (2) horizontal market allocation (Beacon's second and ninth claims); and (3) conspiracy to monopolize (Beacon's seventh and fourteenth claims). Even so, Valleylab argues that Beacon cannot prevail on the

issue of antitrust damages and, thus, summary judgment is appropriate.

Beacon seeks treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a). Section 4 of the Clayton Act provides, in part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a) (1988). An antitrust plaintiff seeking treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a), must prove an antitrust violation, the fact of damage or injury, and measurable damages. *World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1477 (10th Cir.1985).

Valleylab contends Beacon cannot establish the fact of injury. To establish fact of injury, Beacon must demonstrate "a causal connection between the defendant's actions violative of the Sherman Act and the actual injury to the plaintiff's business." *King & King Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1156 (10th Cir. 1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). Damage issues in antitrust cases, however, do not lend themselves to the sort of detailed proof of injury which surfaces in other types of claims. A plaintiff's burden to show a fact of injury, therefore, " 'is satisfied by its proof of some damage flowing from the unlawful conspiracy' which may be established by reasonable inference drawn from circumstantial evidence." *World of Sleep* at 1478 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969)).

Valleylab argues that the Beacon–Birtcher patent litigation occasioned the majority of Beacon's damages because the injunction prohibited Beacon from selling its coagulator base units or handpieces for use with its base units. (Beacon Brf., Order and Judgment of 12/27/91, Tab G.) Valleylab also asserts that the Birtcher–Valleylab patent

license had a negligible effect on the competitive market for sales of argon surgical handpieces: "Beacon could still sell its handpieces directly to customers or through its distribution network. If customers chose not to purchase Beacon's products, then Beacon's injury was due not to Valleylab but to the operation of the competitive process." (Valleylab Brf. at 47.)

Beacon's response to Valleylab's arguments with respect to damages is scant. Beacon's conclusory allegation that the Birtcher–Valleylab license agreement excluded Beacon from the market of argon handpiece sales appears throughout Beacon's complaint and brief.

However, the Birtcher–Valleylab patent license agreement, by itself, creates a genuine issue of material fact regarding the existence of Beacon's injury in fact. The Birtcher–Valleylab license agreement, because it contains purchase restrictions hostile to Beacon, could lead a reasonable jury to conclude that the Birtcher–Valleylab license agreement caused injury in fact to Beacon's business. I therefore deny Valleylab's motion for summary judgment on Beacon's remaining antitrust claims.

### H. Beacon's Fifteenth Claim for Relief: Breach of Contract

Valleylab also seeks summary judgment on Beacon's breach of contract claim. Beacon alleges that Valleylab wrongfully terminated the March, 1992 interim distribution agreement. The agreement states, in part:

This Agreement shall remain in effect for an initial period ending December 31, 1992 and shall be renewed automatically for succeeding periods of one (1) year each, subject to the right of either party to terminate, at the end of the initial or any extended period, by written notice from one party to the other at least ninety (90) days in advance of the end of such period.

(II Valleylab Brf., March, 1992 Interim Distribution Agreement, Tab 25 at ¶ 4.1.)

Valleylab concedes that it did not provide written notice to Beacon as required by the interim agreement. Valleylab, instead, argues that it gave oral notice of termination to Beacon during a meeting on August 28, 1992.

■ Assuming oral notice effectively and properly terminates a contract that expressly calls for written notice under Colorado law, *see Maltby v. J.F. Images, Inc.*, 632 P.2d 646 (Colo.App.1981), Valleylab fails to produce any evidence that it gave Beacon proper oral notice. Valleylab relies on the testimony of James Young, Chief Financial Officer of Beacon, relating to the August 28, 1992 meeting:

Q. And then you knew that at that point, at the $30,000, that was the end of your supply relationship with Valley?

A. 30,000 units, yes.

Q. And at that point in time, you had no idea that there may be a further negotiation on that requirements purchase contract that we identified as D–57?

A. There was no point.

Q. And that the distribution agreement was over when you satisfied the purchase orders?

A. We didn't discuss the distribution agreement at that meeting, that I recall.

Q. But as of—you knew that once you shipped the 30,000 units, that was the end of the supply relationship, correct?

A. Yes.

(I Valleylab Brf., Depo. of James Young, Tab 14 at 160.) The testimony of Mr. Young is ambiguous at best. While he testified that he thought the supply relationship was over, he also testified that the interim distribution agreement was not discussed at the August 28, 1992 meeting.

Although some testimony indicates that Valleylab communicated to Beacon the existence of the Birtcher–Valleylab license agreement at the August 28 meeting, no testimony specifically references the March, 1992 interim distribution agreement. (*See* Beacon Brf., Depo. of Walter Williams, Tab ZZ at 102–04.) Nor does any evidence indicate that Valleylab gave effective oral notice of termination. Because the cited testimony is vague, genuine issues of material fact exist with respect to Beacon's breach of contract claim. I therefore deny Valleylab's motion for summary judgment with respect to Beacon's claim that Valleylab breached the interim distribution agreement.

Beacon also alleges that Valleylab breached the December, 1991 letter of intent which obligated both Beacon and Valleylab to negotiate in good faith to reach agreement on a requirements contract. Valleylab argues that the letter of intent is an unenforceable agreement to agree.

■ The operative language of the December 13, 1991 letter of intent provides, in part:

By executing the Agreement, Valleylab and Beacon each confirm their mutual intention to negotiate in good faith within sixty (60) days and, if successful, to enter into an arrangement for exclusive marketing by Valleylab of the Products and/or other products of Beacon.

(I Valleylab Brf., Letter from Valleylab to Beacon of December 13, 1991, Tab 24 at ¶ 3(e).) Beacon does not contend that Valleylab failed to negotiate in good faith. In fact, Valleylab negotiated until July 1, 1992, four months after the letter of intent terminated by its own terms. (I Valleylab Brf., Depo. of James Young, Tab 14 at 103–04.)

The language of the letter of intent is similar to the agreement in *Griffin v. Griffin*, 699 P.2d 407, 409 (Colo.1985), where two parents agreed to "consult concerning their child's education and jointly select his school." The Colorado Supreme Court held that the agreement was unenforceable because it was an agreement to negotiate and reach a resolution sometime in the future. Because courts cannot force parties to reach an agreement, no remedy was available. *Id.* The December 13, 1991 letter of intent merely creates an agreement to work towards a "successful" arrangement. Because the letter of intent imposed only the obligation to negotiate in good faith, which obligation was satisfied by Valleylab, I grant Valleylab's motion for summary judgment with respect to Beacon's claim that Valleylab breached the December, 1991 letter of intent. *See Mahon v. Harst*, 738 P.2d 1190, 1195 (Colo.App. 1987).

I. Beacon's Sixteenth Claim for Relief:
Promissory Estoppel

Beacon alleges that Valleylab's promise to structure a favorable deal with Beacon

caused Beacon to terminate buy-out discussions with Birtcher. Valleylab makes several contentions with regard to Beacon's claim for promissory estoppel.

■ First, Valleylab argues that it made no legal promise to Beacon. The December 13, 1991 letter of intent contains the following language:

> Valleylab has loaned Beacon the sum of $400,000 for current and near term operating expenses. In consideration of such loan and the agreements of Valleylab herein, Beacon agrees during the term of this Agreement to negotiate in good faith exclusively with Valleylab regarding Transactions into which Valleylab and Beacon might enter upon such terms and conditions as may be mutually agreed. For purposes hereof "Transactions" shall mean any acquisition of Beacon's rights to the Products ..., or any acquisitions of an interest in Beacon or its assets, or any joint venture, distribution or other contractual relationships, other than standard distribution agreements, in each case relating to, in whole or in part, any of the Products. Accordingly, during the term of this Agreement, Beacon shall not engage in any discussions with any third parties regarding any transaction.

(Beacon Brf., Letter from Valleylab to Beacon of December 13, 1991, Tab 24 at ¶ 1.) Valleylab contends that the letter of intent requires Beacon to discontinue negotiations with Birtcher in consideration for the $400,000 loan, not in consideration for a promise to structure a favorable deal.

> The letter of intent, however, also states: By executing the Agreement, Valleylab and Beacon each confirm their mutual intention to negotiate in good faith within sixty (60) days and, if successful, to enter into an arrangement for exclusive marketing by Valleylab of the Products and/or other products of Beacon.

(Id. ¶ 3(e).) A reasonable jury could conclude that Beacon agreed to terminate negotiations with Birtcher, not only in consideration for a $400,000 loan, but also in consideration for a favorable marketing agreement with Valleylab. A genuine issue of material fact exists with regard to whether Valleylab made a promise to Beacon which induced Beacon to terminate merger negotiations with Birtcher.

■ Valleylab also contends that Beacon did not rely to its detriment on Valleylab's promise to structure a favorable deal. Yet once negotiations with Valleylab began and discussions with Birtcher ceased, Beacon notified many of its distributors that it was negotiating an exclusive distribution agreement with Valleylab. (I Valleylab Brf., Depo. of Fleenor, Tab 1 at 108–09.) Beacon executives, understanding that a three-year exclusive agreement with Valleylab was on the immediate horizon, knew that they would have to convince Beacon distributors to "cooperate in not selling Beacon products, perhaps selling off what inventory they had." (I Valleylab Brf., Depo. of Goslau, Tab 2 at 118–19.) Genuine issues of material fact exist with regard to whether Beacon relied to its detriment on Valleylab's alleged promise.

■ Genuine issues of material fact also exist as to whether such reliance was justifiable. The fact that Beacon executives were educated businessmen does not prove Beacon's reliance was unjustified as a matter of law. I therefore deny Valleylab's motion for summary judgment with respect to Beacon's promissory estoppel claim.

### J. Beacon's Seventeenth Claim for Relief: Breach of Covenant of Good Faith and Fair Dealing

■ Beacon's last claim alleges that Valleylab breached a covenant of good faith and fair dealing when it wrongfully terminated the interim distribution agreement. Valleylab does not direct my attention to any evidence in the record which shows the absence of a genuine issue of material fact for trial. Viewing the evidence in a light favorable to Beacon, a genuine issue of material fact exists with regard to whether Valleylab's alleged failure to properly terminate the interim distribution agreement also breached a covenant of good faith and fair dealing. While the proper termination of an at-will contract does not state a claim upon which relief can be granted, an allegation of improper termination of such an agreement does allege an actionable breach. *See Friedman & Son, Inc. v. Safeway Stores, Inc.,* 712

P.2d 1128 (Colo.App.1985). Because genuine issues of fact exist with regard to whether Valleylab improperly terminated the interim distribution agreement, genuine issues of fact also exist with regard to whether such conduct breached a duty of good faith and fair dealing. Accordingly, I deny Valleylab's motion for summary judgment with regard to this claim.

## VI. BEACON'S MOTION TO AMEND COMPLAINT

Beacon filed a motion for leave to amend on July 31, 1995. Pursuant to court order and joint stipulation of the parties, pleadings could be amended on or before that date. Beacon requests leave to add certain factual allegations to existing claims as well as two new claims for relief: promissory estoppel and breach of covenant of good faith and fair dealing.

Although leave to amend "shall be freely given when justice so requires," Fed. R.Civ.P. 15(a), whether leave should be granted is left to the trial court's discretion. *Las Vegas Ice & Cold Storage v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir.1990). Considerations of undue delay, unfair prejudice to the opposing party and futility of the amendment, however, temper this strong policy permitting the amendment of pleadings. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Beacon's proposed changes are futile. The proposed amendments to Beacon's existing claims do not affect the analysis of either Valleylab's motion to dismiss, Valleylab's motion for summary judgment, or Beacon's motion for partial summary judgment. The amendments have no practical purpose.

Secondly, Beacon's original complaint already contains both a promissory estoppel claim and a breach of covenant of good faith and fair dealing claim. Beacon admitted during the May 3, 1996 motions hearing that no substantive differences exist between the old claims and the new claims. I therefore deny Beacon's motion to amend its original claim.

Accordingly, I ORDER that:

1) defendant Valleylab's motion to dismiss is DENIED;

2) plaintiff Beacon's motion for partial summary judgment is GRANTED as specified in part III of this memorandum opinion and order;

3) defendant Valleylab's motion for summary judgment is GRANTED as to plaintiff Beacon's third, fourth, fifth, sixth, tenth, eleventh, twelfth and thirteenth claims and these claims are DISMISSED;

4) defendant Valleylab's motion for summary judgment as to that portion of Beacon's fifteenth claim for breach of the December, 1991 letter of intent is GRANTED and, therefore, DISMISSED;

5) defendant Valleylab's motion for summary judgment is DENIED in all other respects; and

6) plaintiff Beacon's motion to amend its original complaint is DENIED.